### In re DOE CHILDREN.

[Cite as *In re Doe Children* (1994), 93 Ohio App.3d 134.]

Court of Appeals of Ohio,
Lucas County.

No. L–92–260.

Decided Feb. 11, 1994.

*Joseph Scalzo, Jr.* and *Charles Rowell, Jr.,* for appellees.

*Lou Ann Frey, Barbara Herring* and *John Mather,* for appellant.

ABOOD, Presiding Judge.

This is an appeal from an order of the Lucas County Court of Common Pleas, Juvenile Division, which granted temporary custody of Ann, Beth, David and Steven Doe to the Lucas County Children Services Board.[1]

Appellant Lucas County Children Services Board ("LCCSB") sets forth the following assignments of error:

"I.   The manifest weight of the evidence presented at the permanent custody trial satisfied by clear and convincing evidence the statutory requirements of O.R.C. § 2151.414 for an award of permanent custody to appellant.

"II.   The trial court's modification of the January 30, 1992 judgment entry and the subsequent award of temporary custody to appellant was arbitrary and capricious and resulted in an abuse of discretion.

1.   In accordance with R.C. 3107.17, and in the interest of protecting the privacy of all parties to this action, fictitious names have been substituted for the parents and children in this opinion.

"A. The trial court adopted the referee's findings of fact and conclusions of law.

"B. There was no evidence presented to support the statutory requirements for an award of temporary custody to appellant."

The facts that are relevant to the issues raised on appeal are as follows. "Mother" and "Father" Doe have four children who are the subjects of this litigation: Ann, born May 31, 1975; Beth, born June 24, 1980; Steven, born March 16, 1984; and David, born September 25, 1986. On March 22, 1989, LCCSB filed a complaint and motion for shelter care hearing which alleged that Ann and Beth were dependent, neglected and abused children. In its complaint, LCCSB alleged, among other things, that both girls had been sexually molested by their father for four or five years. At a hearing held that same day, emergency temporary custody of both girls was awarded to LCCSB. On May 3, 1989, Ann and Beth were adjudicated abused children and temporary custody was awarded to LCCSB. On March 21, 1990, LCCSB filed a motion for permanent custody of Ann and Beth.

On July 31, 1990, LCCSB filed a motion for shelter care hearing as to Steven and David and a complaint for permanent custody of Beth, David and Steven, and legal custody of Ann. The complaint alleged, among other things, that all four children had been sexually molested by their father and that their mother had been diagnosed as having a dependent personality disorder, had been in therapy for over two years with minimal progress, and did not believe that her husband posed a threat to the children.

On October 16, 22, 23 and 29, 1990, a hearing was held on the then-pending complaints and motions for permanent custody. At the conclusion of the hearing, the referee found that LCCSB had not made reasonable efforts to prevent the removal of the children from the home or to assist in reunification and that LCCSB had not proven by clear and convincing evidence that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. (See attached appendix for referee's findings.) The referee recommended that LCCSB's motion for permanent custody be denied and that LCCSB be granted temporary custody of all four children. Upon the recommendation of the referee, the trial court denied the motion for permanent custody but granted LCCSB temporary custody of David and Steven and extended the agency's temporary custody of Beth and Ann.

On June 17, 1991, LCCSB filed a motion to change disposition to permanent custody as to Ann and Beth and on August 7, 1991, filed an identical motion as to Steven and David. The two motions were consolidated and a hearing was held on both on January 6, 7, 8 and 9, 1992. At the hearing, the referee limited the testimony to evidence of events taking place after January 31, 1991, the date the

trial court denied LCCSB's initial requests for permanent custody following the October 1990 hearing. The evidence presented at the hearing is as follows.

Lisa Wagenhauser, a LCCSB caseworker, testified that she began working with the family in 1990. She stated that Mother was referred to counseling through the Parents United Program, individual counseling, and ALANON. Father was to attend group therapy at Parents United, have a psychological evaluation done, attend individual counseling, participate in a substance abuse assessment and attend Alcoholics Anonymous. As of June 1991, Mother had not discussed the sexual abuse allegations with Father and felt no anger toward him concerning the related problems. Wagenhauser stated that Beth and Ann had been in therapy for two years and had adjusted well to foster care. She stated that Ann does not want to return home and does not want her sister or brothers to return home. Ann had told her that if the children were sent home she would take them away where they could not be found. Wagenhauser stated that both boys are on medication to control their behavior and are undergoing individual counseling. The girls did not have visitation with Mother and Father but the boys visited with their parents once each week for two hours. Wagenhauser testified further that the prospective adoptive parents are willing to accept Ann as a part of the family even if LCCSB is not awarded permanent custody of her. Wagenhauser testified that Mother told her she would never divorce her husband and that she learned in October 1991 that Mother and Father were living together again.

Lori Christman, a counselor with the Maumee Valley Counseling Center and the girls' therapist during early 1991, testified to having worked with Ann and Beth on issues related to their having been sexually molested by their father, their mother's denial of those events, their relationships with each other and their integration into the foster home and school. She stated that both girls were suffering from post-traumatic stress disorder but were making steady progress through treatment. She testified that when she talked to the girls in early 1991 about joint therapy with their mother, Beth was suspicious and Ann was worried that her mother would continue to deny any sexual abuse and blame Ann for lying. Christman testified that both girls needed to be guaranteed a safe environment and that, while they have that now, she was "not at all convinced they would have that at home." She believes Ann is serious about running away with her sister and brothers and that Ann has the wherewithal to try. She testified that Beth has a strong need to love her parents and is hurt and disappointed that she has not been able to do that. Christman sees the possibility that Ann would ever be ready to reunify as remote. Ann has made progress in therapy but is still vulnerable and probably will need intermittent

counseling for several years. Christman could not recommend that either parent regain custody of the girls and sees reunification as a set-up for failure.

Janet Mowery, a clinical therapist with the Maumee Valley Counseling Center, has been Steven and David's therapist since 1990 and the girls' therapist since April 1991. She testified as to working with both boys on issues related to sexual molestation, as well as on post-traumatic stress disorder and behavior management. She testified that the boys had not indicated to her the extent of their sexual abuse but had made comments relative to it. She stated that both boys are experiencing depression related to being taken from their home and moved around and that they are frustrated, with conflicting feelings about going home and knowing who is or is not telling them the truth. Mowery testified to working with the girls on home and school behavior, survivor issues and prevention of sexual abuse. Mowery testified as to two joint therapy sessions between the girls and their mother in June 1991. She stated that after the sessions, the girls said they did not want to return home and that they had not expressed a desire to see their mother since that time.

The boys' foster mother testified that Steven and David had been living in her home since June 1991 and stated that if LCCSB was granted permanent custody of the children she would want to adopt them. She explained that if LCCSB was not granted permanent custody of Ann she would assist in visitation between the children. Foster Mother testified that after their weekly visits with their parents, both boys are moody, sullen and difficult to manage. She stated that their behavior does not return to normal until Monday or Tuesday.

Dr. Terry Scully, a clinical psychologist, testified as to meeting with Beth and Ann in December 1991. He stated that both girls generally expressed positive feelings about their life in the foster home and that they said things were going well at home and in school. He testified that both girls told him they did not want to return home and that they felt that if they did they would be abused again. Dr. Scully stated that both girls could require counseling for years and said he would not recommend returning them to their parents' home. Dr. Scully testified that he could not recall any case in his personal experience where a pedophile had been reunited with the children he had victimized. The doctor testified that it would be only after a year or more of joint therapy that reunification might be possible between the non-offending parent and the children.

Margaret Mandell, a clinical social worker at the Cummings–Zucker center, testified that Mother had been in the Parents United therapy group for non-offending adults, which she facilitates for five thirteen-week cycles. She stated that Mother has been working on getting into school, going out and doing things for herself and on accepting the reality of her situation in terms of the sexual

abuse of her children. Mandell also had both Mother and Father in her Step-Teen parenting class during the summer of 1991 and said she does not think Mother feels Father is a threat to the children.

Dr. Charlene Cassel, a clinical psychologist, evaluated Father upon LCCSB's request in March 1991. She diagnosed Father as an alcoholic in recovery and a pedophile. She recommended individual counseling, group therapy through Parents United and A.A. and said it was critical for Father to remain sober. She considers Father's progress positive and said he is showing some insight into the effect of his abuse upon his children. Dr. Cassel stated that Father appears to sincerely want to change. She said she would see reunification as a possibility in perhaps another one and a half years, but added that many professionals do not agree with her optimistic approach regarding the treatability of pedophiles.

Steven Benjamin, facilitator of an adult offenders group of Parents United at Cummings–Zucker, stated that Father joined his group in May 1991. He testified that Father has stated his responsibility for sexually fondling three of his children but has not gone into detail regarding any of the incidents. Benjamin stated that Father is working on dealing with depression and sobriety and is still in the beginning stages of treatment. He testified that he does not know whether Father has the skills necessary to enable him to control himself enough for his children to be safe with him. Benjamin does not believe Father has made sufficient progress to recommend reunification yet.

Suzanne Smitley, a licensed clinical psychologist, testified that she began an evaluation of Mother in November 1991 but that the tests had not been completed by the time of the hearing.

Dr. James Orlando, a clinical psychologist who treats sexual offenders, testified that it is his opinion that pedophilia is not curable, although in some cases it is controllable. He stated that years of treatment are usually required for everyone involved before reunification is possible.

LCCSB rested and Father moved for a directed verdict, which was denied. Mother and Father consolidated their defense and presented the following witnesses.

Laura West, director of intervention services for Cummings–Zucker, testified that she has been Mother's therapist since August 1990. She testified as to Mother's participation in Parents United programs and in individual counseling and stated that she feels Mother has made progress. She stated that she does not know if Mother has ever confronted Father about the abuse and said she is aware that Mother is living with Father again.

Dr. Robert MacGuffie, a psychologist who works part-time with Substance Abuse Services, Inc., testified as to his work with Father and stated that they had

discussed Father's problems with alcohol. Dr. MacGuffie feels Father could eventually be reunited with his family.

Mother testified that she now believes her children were molested by her husband. She stated that she has discussed the abuse with her husband, although not in detail because they "have not had a chance to." She also testified that she has not had a chance to discuss any details with her counselors, either. She stated that her husband "bothered" the children when he had been drinking but does not recall either daughter telling her about any incidents of sexual abuse. She believes that her husband "touched Ann in places he should not have and made her do things she did not want to do" but does not know what those things were. She stated she believes her husband did the same things to Beth. Mother believes her husband "touched Steven in his privates" but has not discussed any of those details with her husband as of yet. She feels her children would be safe in their home because she could recognize the symptoms of sexual abuse and would be open to talking to her children and listening to them.

Regula Josi, court-appointed special advocate and guardian *ad litem* for the children since September 1991, testified as to her meetings with family members. She stated that both Beth and Ann told her about their father abusing them and said Ann told her that her mother had told her to just stay away from her father. Josi said she talked to Father on two occasions but he was not specific about abusing his children. She testified that she had gone to the home to talk to Mother on many occasions but that Mother was never there. Josi recommended that the court award permanent custody of Beth, Steven and David and legal custody of Ann to LCCSB.

On January 24, 1992, the referee issued a report in which she found that the children could not be placed with either parent within a reasonable time or should not be placed with the parents and that it was in the best interests of the children to grant permanent custody to LCCSB; that the severe and chronic emotional illness of the parents made them unable to provide an adequate permanent home for the children at the present time and in the foreseeable future; that the parents had failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the children to be placed outside the home; and that there was a reasonable probability of the three younger children being adopted. The referee recommended that LCCSB be awarded permanent custody of Beth, Steven and David and legal custody of Ann. On January 30, 1992, the trial court adopted the referee's report. Both Father and Mother filed objections. On February 19, 1992, a hearing was held on the objections and on March 4, 1992, the trial court modified its January 30, 1992 decision and ordered temporary custody of all four children to LCCSB. On March 16, 1992, LCCSB filed a motion for reconsideration of the trial court's

modification. On April 2, 1992, after a hearing, the trial court dismissed both complaints "not on the merits." On April 3, 1992, LCCSB filed a new complaint and motion for shelter care for all four children and was again awarded temporary custody of the children. On June 5, 1992, Mother and Father filed a joint motion to dismiss the April 3, 1992 complaint on jurisdiction and *res judicata* grounds. On June 17, 1992, the trial court filed its judgment entry in which it found the parents' motion well taken and dismissed LCCSB's April 3, 1992 complaint; found its April 2, 1992 order void and held for naught; and reinstated and affirmed its March 4, 1992 order granting temporary custody of all four children to LCCSB. LCCSB filed timely appeals of both the June 17, 1992 order and the March 4, 1992 order. The two appeals have been consolidated.

Appellees have raised certain jurisdictional issues which we will address before turning to appellant's assignments of error. Appellees argue in their brief, as they argued in the June 5, 1992 motion, that the trial court's jurisdiction over Ann and Beth expired on March 22, 1991, following the initial one-year temporary custody order and two six-month extensions, and that after that date the court could not grant any form of custody to LCCSB without a new complaint being filed.

Appellant responds that R.C. Chapter 2151 provides for continuing jurisdiction with the juvenile court until a child reaches the age of eighteen once the court issues an order of disposition pursuant to R.C. 2151.353(A). Appellant asserts that, in an effort to avoid "foster care drift," the Revised Code sets forth termination dates for temporary custody orders but does not provide for termination of the court's jurisdiction. Appellant states that if a child is held in temporary custody beyond the limits of the court's order, the complaining party may file a motion for release from shelter care or seek a writ of habeas corpus but has no basis for an argument that the juvenile court's jurisdiction has terminated. (Father did file a petition for a writ of habeas corpus on June 6, 1991, as to Ann and Beth, which the trial court denied on June 17, 1991, finding that a remedy at law was available through a motion to release the children from shelter care. Father never filed such a motion, however, and when LCCSB filed a new motion for shelter care on July 8, 1991, and a hearing was held on the motion that same day, both Mother and Father consented to the shelter care.)

■ Pursuant to R.C. 2151.23(A)(1), the juvenile court has exclusive original jurisdiction "concerning any child who on or about the date specified in the complaint is alleged to be a juvenile traffic offender, or a delinquent, unruly, abused, neglected or dependent child." The juvenile court, therefore, had exclusive original jurisdiction over Beth, Ann, Steven and David Doe once the complaints which alleged that they were dependent, neglected and abused children were filed.

As set forth above, on October 29, 1990, the trial court ordered temporary custody of the four Doe children to LCCSB pursuant to R.C. 2151.353(A)(2), which states:

"(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

" * * *

"(2) Commit the child to the temporary custody of a public children services agency * * * for placement in a certified foster home or approved foster care[.]"

On June 17, 1991 and August 7, 1991, LCCSB filed motions to change disposition to permanent custody pursuant to R.C. 2151.417(B) and 2151.-353(E)(2).

R.C. 2151.417(B) states:

"(B) *If a court issues a dispositional order pursuant to section 2151.353 * * * 2151.414 * * * or 2151.415 of the Revised Code, the court has continuing jurisdiction over the child as set forth in division (E)(1) of section 2151.353 * * * of the Revised Code. The court may amend a dispositional order in accordance with division (E)(2) of section 2151.353 * * * of the Revised Code at any time upon its own motion or upon the motion of any interested party.*" (Emphasis added.)

R.C. 2151.353(E)(2) states:

"(2) Any public children services agency by filing a motion with the court, may at any time request the court to modify or terminate any order of disposition issued pursuant to division (A) of this section. The court shall hold a hearing upon the motion as if the hearing were the original dispositional hearing."

R.C. 2151.353(E)(1) provides in pertinent part:

"(E)(1) The court shall retain jurisdiction over any child for whom the court issues an order of disposition pursuant to division (A) of this section until the child attains the age of eighteen."

▇ Upon consideration of the foregoing, this court finds that the juvenile court had jurisdiction over the four Doe children from the dates of the original adjudications of each child and that it will continue to have jurisdiction until each child reaches the age of eighteen.

We now turn to appellant LCCSB's assignments of error. Because both assignments of error essentially assert that the evidence does not support the trial court's modification of its own order granting permanent custody to LCCSB, we will consider them together.

■ In its first assignment of error, LCCSB asserts that the weight of the evidence presented at the January 1992 permanent custody hearing satisfied the requirements of R.C. 2151.414 for an award of permanent custody to the agency. LCCSB argues that the trial court's findings following the hearing supported a ruling pursuant to R.C. 2151.414(E) that the children could not be placed with either parent within a reasonable period of time or should not be placed with their parents.

Appellant asserts in its second assignment of error that the trial court abused its discretion when it modified its January 30, 1990 judgment entry and granted LCCSB temporary custody of the children. Appellant essentially argues that the trial court initially adopted the referee's findings of fact and conclusions of law which supported an award of permanent custody but then modified its decision only with respect to the final award of custody, letting stand all of the referee's findings and conclusions and articulating no reasons for its change of mind.

Appellees respond that the trial court did not adopt the referee's findings of fact following the trial and that there is therefore no way of knowing what the court concluded as to the evidence presented.

Upon consideration of the trial court's January 30, 1992 judgment entry, this court preliminarily finds that the trial court did adopt the referee's report in arriving at its decision and judgment.

R.C. 2151.414 provides in pertinent part:

"(B) The court may grant permanent custody of a child to movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

"(1) The child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents;

" * * *

"(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

"(1) *The reasonable probability of the child being adopted,* whether an adoptive placement would positively benefit the child, and whether a grant of permanent custody would facilitate an adoption;

"(2) *The interaction and interrelationship of the child with his parents, siblings, relatives, foster parents* and out-of-home providers, and any other person who may significantly affect the child;

"(3) *The wishes of the child,* as expressed directly by the child or through his guardian ad litem, with due regard for the maturity of the child;

"(4) The custodial history of the child;

"(5) *The child's need for a legally secure permanent placement* and whether that type of placement can be achieved without a grant of permanent custody to the agency.

"(E) *In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents:*

"(1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, *the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home.* In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

"(2) The severe and chronic mental illness of the parent makes the parent unable to provide an adequate permanent home for the child at the present time and in the foreseeable future[.]" (Emphasis added.)

Clear and convincing evidence is that proof which establishes in the minds of the trier of fact a firm conviction as to the allegations sought to be proved. *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118.

Upon consideration of the entire record of proceedings in the trial court and the law, this court finds that (1) there was clear and convincing evidence presented at the January 1992 hearing that the four Doe children could not be placed with either of their parents within a reasonable time; (2) the findings of

the referee as adopted by the trial court clearly support the award of permanent custody that was entered by the trial court on January 30, 1992; and (3) the trial court acted unreasonably and in abuse of its discretion by modifying its January 30, 1992 award of permanent custody of Beth, David and Steven to an award of temporary custody. Accordingly, we find appellant's first and second assignments of error well taken.

On consideration whereof, this court finds that substantial justice has not been done the party complaining, and the judgments of the Lucas County Court of Common Pleas, Juvenile Division, entered on March 4, 1992 and June 17, 1992, are reversed and the trial court's order of January 30, 1992, which granted permanent custody of Beth, Steven and David Doe and legal custody of Amy Doe to the Lucas County Children Services Board is hereby reinstated. Costs assessed to appellees.

*Judgments accordingly.*

HANDWORK and MELVIN L. RESNICK, JJ., concur.

APPENDIX

Referee's Findings

"1. Case plans were filed in 89–10031 on 5/16/89, 8/28/89, 4/30/90 and 6/20/90. The case plan of 5/16/89 included a psychological exam for Ms. Doe; the case plan of 8/28/90 included casework services to include a monthly contact with parent. Mrs. Doe was to complete the requirements of her probation and attend Parents United; the case plan of 4/20/90 included parenting classes and counseling for Mrs. Doe; the case plan of 6/20/90 included Parents United and therapy for Mr. Doe. No services were offered to Mr. Doe prior to the filing of permanent custody by Lucas County Children Services Board. Lucas County Children Services did not arrange a psychological for Mr. Doe as ordered on 3/28/89.

"2. Mr. Doe attempted contact with Ann Doe at a park near the foster home on 7/20/90 when visits were to occur only when supervised. There was phone contact between the parents and girls during a no contact order. Some of the phone contact[s] were initiated by the girls. Father sent Ann a letter 10/89 while she was in foster care and during a no contact order.

"3. Mrs. Doe plead[ed] guilty to child endangering as a result of the girls['] sexual abuse. She was placed on probation. Father was acquitted of all criminal charges.

"4. Ann and Beth both have told several people the details of their sexual abuse by father which included vaginal fondling and penetration and oral sex. The girls consistently reported these incidents to their foster mother; Lori

Christman, Dr. Terry Scully, Ph.D. The girls report that they told their mother who said father is sick and the girls should stay away from him.

"5. Lori Christman has seen the girls in therapy 32 times in 14 months. Ann and Beth Doe are both diagnosed with post-traum[at]ic stress disorder. The girls['] relationship has improved over time. Ms. Christman believes that Ann and Beth cannot go home until the issue of sexual abuse is resolved. Ms. Christman never requested to see mother with girls because mother had her own therapist and mother was still denying the sexual abuse of the girls by father.

"6. Dr. Terry Scully evaluated both Beth and Ann in 6/89. Ann was found to be in the superior range of intelligence; Beth was found to be in the lower range of average intelligence. At that time Dr. Scully recommended counseling for each of the girls, and with regard to Ann his report stated: 'Once therapy is under way, the client's counselor will hopefully be able to mediate meetings between Ann and her mother.' However, in court Dr. Scully stated family therapy could not begin until the adult took responsibility for their actions. Laura West from Parents United felt it was important that mother and child have counseling together for reunification to occur. There has been no joint therapy set up for mother and girls, despite the above and mother's repeated request to discuss the issue of sexual abuse with girls face to face.

"7. Dr. Scully saw Ann and Beth briefly in 10/90, just prior to the trial. The changes he observed in the girls were that they were more verbal and relaxed. Dr. Scully stated that reunification in his opinion is dependent upon an admission from mother and father of sexual abuse. If parents were to admit the sexual abuse today the average length of treatment would be two years. There was no evidence as to whether or not reunification would occur at the end of treatment or whether it would occur at some time during the 2 years of treatment. In Dr. Scully's opinion these two girls need more emotional support then [sic] a typical child. Dr. Scully also stated that in order for father to have effective treatment he would have to admit to the sexual abuse of the girls. Further, Dr. Scully stated therapy can facilitate such an admission. Father was not offered therapy in a case plan until June, 1990. Thereafter, no therapy was ever arranged for father by Lucas County Children Services. In Dr. Scully's opinion a true pedophile is not treatable; however if it were social and emotional factors which lead to the sexual abuse, those offenders are approachable. There was no evidence presented as to the nature of father's psychological disorder or whether he is amiable [sic] to treatment.

"8. John Brikmanis evaluated mother and diagnosed her as having a dependent personality disorder with above average intelligence. This diagnosis is consistent with how mother presented herself during testimony and other de-

scriptions of mother. Ann described her mother as being 'addicted' to her father. Therapy for this disorder is usually long-term, 1–2 years and are [*sic*] difficult to treat. This therapy begins with work on self-esteem and assertiveness. Dependent personality disorder impacts parenting with regard to the issue of protecting the children. According to Sheri Beerbower of Cummings–Zucker, mother has made some strides in self-esteem and assertiveness.

"9. During the trial mother still denied that father had sexually abused any of the children, although by the end of the trial mother admitted that the girls were sexually abused by someone other than father. Mother was aware that if father returned home both Steven and David would be removed. Mother chose to have father return home. Father was unaware that if he returned home, Steven and David would be removed.

"10. When father was in his early 20's he was convicted of gross sexual imposition with regard to a step-sister who was approximately 13 years of age. During that offense father had been drinking.

"11. In 1985, while the family lived in North Carolina father molested Ann. Father had her rub his "Charlie Horse" (child's term for penis) and father would put it between her legs. Ann stated father would hit her if she did not do the actions as described above. During one of these incidents father put his penis in her butt. Two weeks after the incidents began Ann told her mother. Father was drinking during some of these incidents, during some he was not. Mrs. Doe left North Carolina with the children at the same time father had been put in jail regarding sexual abuse of the children.

"12. Father in the past has had an alcohol problem. Father has not had a drink since 7/89. He attends 3–5 AA meetings per week. Father has attended Parents United since 9/17/90. Lucas County Children Services did not set up service until then. Father is progressing in Parents United, although at time of trial father had not admitted to sexual abuse. It is not unusual for a prepatrator [*sic*] not to have admitted in that short of time. Father began attending parenting classes on his own. Lucas County Children Services caseworker had only *one* contact with father, which was by phone, between September 20, 1989 and May 10, 1990. Father states that if Lucas County Children Services had requested him to move from mother's home he would have moved out of the home rather than having Steven and David removed. Average length of treatment for an adult in Parents United is 2 years.

"13. Ann does not want to be adopted, but does want to be placed with her siblings and does not want to return home. Beth is adamant that she wants to be adopted. Steven and David appear well adjusted in their foster home. Neither

has * * * special needs which would prevent their adoption. All the children need to be in an environment which is emotionally safe.

"14. Mother has attended Parents United since 9/89. She has made progress in self-esteem and assertiveness. Mother has made little improvement with regard to admitting there was sexual abuse and that the father is the prepatrator [*sic*]. This admission is key to reunification.

"15. Mother attended parenting classes through the Toledo Public Schools. Her attendance was good and the instructor never observed inappropriate behavior between mother and children.

"16. Georgia Poole a Lucas County Sheriff Deputy observed mother and Steven and David on numerous occasions. At all times the boys were well behaved and responded to mother when she corrected them.

"17. Guardian Ad Litem recommends permanent custody to Lucas County Children Services Board. Guardian Ad Litem investigation consisted of talking with caseworker, attending Lucas County Children Service Board staffings and annual reviews, and one contact with children during the trial. The Guardian Ad Litem did not make any home visits or have contact with parents outside of staffing, annual reviews and hearings.

"18. Lucas County Children Services has not exercised diligent efforts to assist the father to remedy the problems which initially caused the children to be removed. Lucas County Children Services literally offered no services to Mr. Doe in the hopes that he would be convicted of the criminal charges pending against him. There was no evidence submitted by Lucas County Children Services that proves by clear and convincing evidence that Mr. Doe would not respond to therapy if offered. Mr. Doe has attended parenting classes, Parents United, and AA on his own ini[ti]ative."