OPINION
{¶ 1} Appellant, Rosetta J. ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch ("juvenile court"), which granted permanent care and custody of her great-grandchildren, C.M. and M.M., to Franklin County Children Services ("FCCS"), and which dismissed *Page 2 
appellant's motion to modify custody.[1] For the reasons that follow, we affirm the juvenile court's judgment.
 {¶ 2} Appellant is the maternal great-grandmother of C.M., a four-year-old girl, and M.M., a three-year-old boy. D. M., appellant's granddaughter, is the mother of C.M. and M.M. When D.M. was a young child, D.M. was placed in the custody of appellant. At some point, appellant relinquished custody of D.M. . In June 2003, when D.M. was approximately 13-years old, she was returned to the custody of appellant. At the time of her return, D.M. was pregnant. On September 21, 2003, D.M. bore a daughter, C.M. Jeremy H. is the putative father of this child.
 {¶ 3} Because appellant informed FCCS that she could not continue to serve as D.M.'s custodian due to D.M.'s unruly behavior, in September 2004 FCCS received temporary custody of D.M. Accordingly, D.M. and C.M. were placed with Veda M., D.M.'s mother. Approximately one month after having been placed with her mother, D.M. absconded from her mother's home and abandoned C.M. After D.M.'s mother contacted FCCS and informed staff she could not care for C.M. if D.M. was absent from the home, FCCS was granted emergency custody of C.M. In October 2004, FCCS placed C.M. in a foster home, and approximately one month later, FCCS placed C.M. in a relative's home. In December 2004, C.M. was placed in a foster care home with D.M.
 {¶ 4} On April 7, 2005, D.M. bore another child, a son, M.M. Marvin J. is the father of M.M. Shortly after his birth, M.M. was placed in the same foster care home as *Page 3 
his mother, and his half sister, C.M. In June 2005, however, D.M. was moved to another foster care home. In approximately October 2005, custody of C.M. and M.M was returned to D.M., who at that time was residing with her mother.
 {¶ 5} In January 2006, however, FCCS again received custody of C.M. and M.M. After FCCS received custody of C.M., FCCS placed C.M. and M.M. with appellant. In February 2006, the children were moved to a foster care home. Both C.M. and M.M. have resided in this same foster care home since approximately February 2006.
 {¶ 6} Because parties believed that D.M. might be more successful in satisfying her case plan if she lived in the same foster care home as her children, in May 2006, FCCS placed D.M. in the same foster care home with C.M. and M.M. Two days after having been placed in this foster care home, however, D.M. absconded with C.M. and M.M., as well as with another child that was in the foster care home.
 {¶ 7} By complaint filed on June 23, 2006, claiming, among other things, that D.M. demonstrated limited parenting skills and D.M. had a history of placing her children at risk, FCCS alleged C.M. and M.M. were dependent children pursuant to R.C 2151.04(C). In its complaint, FCCS sought a disposition under R.C. 2151.353, including, but not limited to, granting temporary custody, or permanent commitment, of the children to FCCS. On June 30, 2006, finding, among other things, that continued placement of the children in their home was contrary to their welfare and best interests, the juvenile court, through a magistrate, granted temporary custody of the children to FCCS.
 {¶ 8} On September 5, 2006, the juvenile court, through a magistrate, held an adjudicatory hearing to consider FCCS's claim that C.M. and M.M. were dependent minors. Following the hearing, a magistrate issued a decision, wherein he found that *Page 4 
C.M. and M.M. were dependent children, as defined in R.C. 2151.04(C). Accordingly, the magistrate adjudged C.M. and M.M. wards of the court and temporarily committed them to the custody of FCCS.[2] On September 18, 2006, finding no error of law or other defect on the face of the magistrate's decision, the juvenile court approved and adopted the magistrate's decision as its own.
 {¶ 9} Approximately five months later, on February 20, 2007, proceeding pro se, appellant moved to be joined as a party. At the same time, claiming that C.M. and M.M. would benefit by being cared for in her home, appellant also requested a change in custody. The juvenile court ultimately granted appellant's motion to be joined as a party to the action.
 {¶ 10} On March 30, 2007, claiming, among other things, that the children were abandoned; the children could not be placed with their parents within a reasonable time, or should not be placed with their parents; and the children had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period, FCCS moved the court for an order committing C.M. and M.M. to the permanent custody of FCCS pursuant to R.C. 2151.413 and 2151.414. Following FCCS's motion for permanent custody, and prior to a permanent custody hearing, the children's mother, D.M., moved the juvenile court to grant legal custody of C.M. and M.M. to appellant. *Page 5 
 {¶ 11} After conducting a hearing, the juvenile court awarded permanent custody of the children to FCCS, and the juvenile court dismissed appellant's motion for a change in custody.[3]
 {¶ 12} In its judgment, however, the juvenile court failed to render an express determination regarding D.M.'s motion seeking transfer of legal custody of her children to appellant. Because the juvenile court ultimately granted permanent custody of C.M. and M.M. to FCCS, and because the juvenile court dismissed appellant's motion for a change in custody, absent any express determination by the juvenile court regarding D.M.'s motion seeking transfer of legal custody of her children to appellant, we presume the juvenile court overruled D.M.'s motion. See State ex rel. The V Cos. v. Marshall (1998),81 Ohio St.3d 467, 469, citing State ex rel. Cassels v. Dayton City School Dist. Bd.of Edn. (1994), 69 Ohio St.3d 217, 223; Newman v. Al Castrucci FordSales (1988), 54 Ohio App.3d 166, jurisdictional motion overruled (1989), 41 Ohio St.3d 725 (stating that "when a trial court fails to rule on a pretrial motion, it may ordinarily be presumed that the court overruled it").
 {¶ 13} From the juvenile court's judgment awarding permanent custody of C.M. and M.M. to FCCS, appellant now appeals and assigns four errors for our consideration:
 First Assignment of Error
 PROPER SERVICE, ACCORDING TO JUVENILE RULE OF PROCEDURE 4, OF THE MOTION FOR PERMANENT COMMITMENT WAS NOT ACHIEVED BY THE COURT, IN THAT THE NOTICE OF SERVICE BY PUBLICATION *Page 6 
FAILED TO SET FORTH THE LAST KNOWN ADRESS OF THE FATHER OF THE CHILDREN. THE COURT IS WITHOUT JURISDICTION TO MAKE ANY ORDER, THEREFORE, IN THIS CASE. THE COURT FAILED TO ASCERTAIN WHETHER SERVICE HAD BEEN PERFECTED PURSUANT TO OHIO RULE OF JUVENILE PROCEDURE 29(A)(1) GOVERNING THE ADJUDICATORY HEARING.
 Second Assignment of Error
 THE JUVENILE COURT TRIAL COURT ERRED IN THAT DESPITE GRANTING PARTY STATUS TO APPELLANT GREAT-GRANDMOTHER ROSETTA [J.], THE COURT FAILED TO ADVISE HER OF HER RIGHT TO COUNSEL DURING THE PROCEEDINGS, FAILED TO ALLOW THE APPELLANT TO PARTICIPATE IN THE PROCEEDINGS, TO INTERPOSE QUESTIONS TO THE WITNESSES AND TO MOTION THE COURT AT CRITICAL PERIODS OF THE PROCEEDINGS AS REQUIRED BY OHIO RULES OF JUVENILE PROCEDURE, RULE 29(B), 1-5.
 Third Assignment of Error
 THE GUARDIAN AD LITEM FAILED TO CONDUCT A MEANINGFUL EXAMINATION OF THE WISHES OF THE CHILDREN IN REGARD TO THE PROCEEDINGS CONSISTENT WITH THEIR LEVEL OF DEVELOPMENT AND THAT THIS FAILURE MAY HAVE RESULTED IN AN UNCONSTITUTIONAL DEPRIVATION OF COUNSEL FOR THE CHILDREN DURING THE PROCEEDINGS.
 Fourth Assignment of Error
 THE TRIAL COURT'S FINDING THAT THE CHILDREN SHOULD BE COMMITTED TO THE FRANKLIN COUNTY CHILDREN SERVICES CUSTODY WAS VIOLATIVE OF OHIO REVISED CODE SECTION 2151.41(D)(3)(a) [sic] IN THAT A COMPELLING REASON EXISTS THAT PERMANENT CUSTODY IS NOT IN THE INTERESTS OF THE CHILDREN. THE COMPELLING REASON IS THE AVAILABILITY OF A SUITABLE RELATIVE, APPELLANT ROSETTA [J.], AS A PERMANENT AND SECURE CUSTODIAN OF THE CHILDREN. *Page 7 
 {¶ 14} At the outset, we recognize that, ideally, a great grandparent will be bound to his or her great grandchild, not only by ties of blood, but by ties of love and affection. We also must recognize, however, that the law does not provide a great grandparent with inherent legal rights based simply on a familial relationship. See, e.g., In re H.W.,114 Ohio St.3d 65, 2007-Ohio-2879, at ¶ 9 (discussing legal rights of grandparents vis-à-vis grandchildren).[4] Cf. Troxell v.Granville (2000), 530 U.S. 57, 65-66, 120 S.Ct. 2054, quoting Prince v.Massachusetts (1944), 321 U.S. 158, 166, 64 S.Ct. 438, rehearing denied,321 U.S. 804, 64 S.Ct. 784 (stating that "`[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder'"). *Page 8 
 {¶ 15} "[T]o terminate parental rights, the movant must demonstrate by clear and convincing evidence that (1) termination is in the child's best interests, and (2) one of the four factors enumerated in R.C. 2151.414(B)(1) applies." In re J.Z., Franklin App. No. 05AP-8,2005-Ohio-3285, at ¶ 10, citing In re Gomer, Wyandot App. No. 16-03-19,2004-Ohio-1723, appeal not allowed, 102 Ohio St.3d 1473, 2004-Ohio-2830; see, also, R.C. 2151.414(B)(1) and (D). "Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." In re J.Z., at ¶ 10, citing In re Abram, Franklin App. No. 04AP-220, 2004-Ohio-5435, appeal not allowed,104 Ohio St.3d 1441, 2004-Ohio-7033. Clear and convincing evidence "is considered a higher degree of proof than a mere `preponderance of the evidence,' the standard generally utilized in civil cases; however, it is less stringent than the `beyond a reasonable doubt' standard used in criminal trials." In re Nibert, Gallia App. No. 03CA19, 2004-Ohio-429, at ¶ 15. Clear and convincing evidence, however, "does not mean clear and unequivocal evidence and does not require proof beyond a reasonable doubt." In re J.Z., at ¶ 10, citing In re Abram, supra.
 {¶ 16} "An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." In re Siders
(Oct. 29, 1996), Franklin App. No. 96APF04-413, citing In reBrofford (1992), 83 Ohio App.3d 869, 876-877; In re Hiatt (1993),86 Ohio App.3d 716, motion to file notice of appeal instanter denied,67 Ohio St.3d 1406. See, also, In re Nibert, at ¶ 15-16. Cf. In reEllis (Aug. 27, 1999), Mahoning App. No. 97 CA 246, citing In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368 (stating that "[a]n appellate court shall not reverse a trial court's determination concerning *Page 9 
parental rights unless the determination is not supported by sufficient credible evidence to meet the clear and convincing standard of proof").
 {¶ 17} By her first assignment of error, appellant asserts the juvenile court lacked jurisdiction because service by publication as to the permanent commitment hearing was not perfected upon the children's maternal grandfather in a manner required by Juv. R. 29.
 {¶ 18} "Jurisdiction" refers to a court's statutory or constitutional power to adjudicate a case. Pratts v. Hurley, 102 Ohio St.3d 81,2004-Ohio-1980, at ¶ 11. In Pratts, the Supreme Court of Ohio explained:
 "Jurisdiction" means "the courts' statutory or constitutional power to adjudicate the case." * * * The term encompasses jurisdiction over the subject matter and over the person. * * * Because subject-matter jurisdiction goes to the power of the court to adjudicate the merits of a case, it can never be waived and may be challenged at any time. * * * It is a "condition precedent to the court's ability to hear the case. If a court acts without jurisdiction, then any proclamation by that court is void." * * *
Id. at ¶ 11. (Citations omitted.)[5]
 {¶ 19} The Pratts court also explained:
 The term "jurisdiction" is also used when referring to a court's exercise of its jurisdiction over a particular case. * * * "`The third category of jurisdiction [i.e., jurisdiction over the particular case] encompasses the trial court's authority to determine a specific case within that class of cases that is within its subject matter jurisdiction. It is only when the trial court lacks subject matter jurisdiction that its judgment is void; lack of jurisdiction over the particular case merely renders the judgment voidable.'" * * * "Once a tribunal has jurisdiction over both the subject matter of an action and the parties to it, `* * * the right to hear and determine is perfect; and the *Page 10 
decision of every question thereafter arising is but the exercise of the jurisdiction thus conferred[.]' * * *
Id. at ¶ 12. (Citations omitted.)
 {¶ 20} Former R.C. 2151.07 provides in part that "[t]he juvenile court is a court of record within the court of common pleas. The juvenile court has and shall exercise the powers and jurisdiction conferred in Chapters 2151. and 2152. of the Revised Code."[6] See, also, former R.C. 2151.23(A)(1) (jurisdiction of juvenile court) (stating in part that "[t]he juvenile court has exclusive original jurisdiction under the Revised Code as follows: (1) [concerning any child who on or about the date specified in the complaint, indictment, or information is alleged * * * a[n] * * * abused, neglected, or dependent child").[7]
 {¶ 21} "The General Assembly established the jurisdiction of juvenile courts and, in R.C. 2151.23(A)(1), granted them exclusive, original jurisdiction concerning matters involving a neglected or dependent child." In re J.J., 111 Ohio St.3d 205, 2006-Ohio-5484, at ¶ 11; see, also, In re Doe Children (1994), 93 Ohio App.3d 134, 141, cause dismissed, 69 Ohio St.3d 1481 (finding that juvenile court had exclusive jurisdiction once complaints alleging minors were dependent, neglected, and abused children were filed).
 {¶ 22} Here, in June 2006, FCCS alleged C.M. and M.M. were dependent children pursuant to R.C. 2151.04(C). And, in March 2007, FCCS's motion for permanent custody was filed pursuant to R.C. 2151.413 and 2151.414.
 {¶ 23} Accordingly, the instant action involving the permanent custody of C.M. and M.M. following a complaint alleging dependency is within the subject-matter jurisdiction of *Page 11 
the juvenile court under former R.C. 2151.23(A)(1). See In re J.J., at ¶ 11 (finding that an action involving the permanent custody of a child following a complaint alleging neglect was within the subject-matter jurisdiction of the juvenile court under R.C. 2151.23[A][1]).
 {¶ 24} Because the action at issue is within the class of cases that is within the juvenile court's subject-matter jurisdiction, we therefore must conclude that the juvenile court properly had subject-matter jurisdiction of the permanent custody proceeding. We must also conclude that the juvenile court's judgment as to permanent custody was not void ab initio, as appellant claims. See Patton v. Diemer (1988),35 Ohio St.3d 68, at paragraph three of the syllabus (holding that "[a] judgment rendered by a court lacking subject matter jurisdiction is void abinitio"); see, also, Pratts, at ¶ 12 (stating that "`"[i]t is only when the trial court lacks subject matter jurisdiction that its judgment is void; lack of jurisdiction over the particular case merely renders the judgment voidable"'"). (Citations omitted.)
 {¶ 25} Appellant nevertheless maintains that the juvenile court lacked jurisdiction because service by publication purportedly was not perfected upon Darryl, a.k.a. Darl F., who is the putative maternal grandfather of C.M. and M.M. And, because service by publication purportedly was not perfected upon Darl F., appellant reasons that the juvenile court's award of permanent custody of the children to FCCS constitutes prejudicial error. For the reasons set forth below, appellant's contention is unconvincing.
 {¶ 26} First, because, as discussed above, the juvenile court had subject-matter jurisdiction over proceedings at issue, appellant's claim that service by publication of the children's putative maternal grandfather was defective devolves into a claim that the juvenile court lacked personal jurisdiction over the children's putative maternal *Page 12 
grandfather or, alternatively, that the juvenile court improperly exercised its jurisdiction over the instant case.
 {¶ 27} Absent any injury in fact that is prejudicial to the rights of appellant, whether appellant has standing to raise the issue of personal jurisdiction as to the children's putative maternal grandfather is not well-taken. See In re Johnson, Franklin App. No. 03AP-1264,2004-Ohio-3886, at ¶ 12, appeal not allowed, 103 Ohio St.3d 1465,2004-Ohio-5056, reconsideration denied, 104 Ohio St.3d 1412,2004-Ohio-6364, citing State v. Ward (Sept. 21, 1988), Summit App. No. 13462 (stating that "[a]n appealing party may complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant"); see, also, In re Thornburg (Jan. 26, 1999), Franklin App. No. 98AP-466, dismissed, appeal not allowed,85 Ohio St.3d 1477, citing State ex rel. Athens Cty. Dept. of Human Serv.v. Wolf (1991), 77 Ohio App.3d 619, following State ex rel. DaytonNewspapers v. Phillips (1976), 46 Ohio St.2d 457 (stating that "[g]enerally, to have standing to raise an issue, a party must allege that the challenged action caused it injury in fact and that the interest asserted is within the scope of interests protected by the statute"). Moreover, absent any injury to appellant, we cannot conclude that the juvenile court's exercise of jurisdiction over the instant case constitutes prejudicial error, and we find such purported error is harmless. See, generally, Civ. R. 61 (harmless error).[8] *Page 13 
 {¶ 28} Second, whether the juvenile court perfected personal jurisdiction over the children's putative maternal grandfather, a person without parental rights and who, under the facts of this case had no involvement with C.M. or M.M., is irrelevant to appellant's claim that the juvenile court prejudicially erred by failing to grant permanent custody of C.M. and M.M. to appellant.
 {¶ 29} Third, to the extent that appellant may have intended to claim that service by publication was not perfected upon C.M.'s putative father, Jeremy H., we find such an argument also lacks merit. Our review of the record shows that Jeremy's last known address was unknown as previous attempts to serve him were unsuccessful. See, generally, Juv. R. 16; see, also, Civ. R. 4.4.
 {¶ 30} Fourth, appellant's reliance upon Juv. R. 29(B)(1), which concerns adjudicatory hearings, is inapposite as the permanent commitment hearing was a dispositional hearing, not an adjudicatory hearing. See In re Williams, Franklin App. No. 03AP-1007, 2004-Ohio-678, at ¶ 7; see, also, Juv. R. 2(M) (defining "dispositional hearing" as "mean[ing] a hearing to determine what action shall be taken concerning a child who is within the jurisdiction of the court"). Cf. Juv. R. 2(B) (defining "adjudicatory hearing"). Because Juv. R. 29(B)(1) is inapposite, appellant's reliance on Juv. R. 29(B)(1) in support of her first assignment of error is not persuasive.
 {¶ 31} Accordingly, for the reasons set forth above, appellant's first assignment of error is not well-taken, and we overrule appellant's first assignment of error.
 {¶ 32} By her second assignment of error, relying on Juv. R. 29(B), appellant asserts that the juvenile court prejudicially erred by failing to advise her of a right to *Page 14 
counsel, by failing to allow appellant to question witnesses, and by failing to allow appellant to move the court at critical periods during the permanent custody hearing.
 {¶ 33} Juv. R. 29(B) provides:
 At the beginning of the hearing, the court shall do all of the following:
 (1) Ascertain whether notice requirements have been complied with and, if not, whether the affected parties waive compliance;
 (2) Inform the parties of the substance of the complaint, the purpose of the hearing, and possible consequences of the hearing, including the possibility that the cause may be transferred to the appropriate adult court under Juv. R. 30 where the complaint alleges that a child fourteen years of age or over is delinquent by conduct that would constitute a felony if committed by an adult;
 (3) Inform unrepresented parties of their right to counsel and determine if those parties are waiving their right to counsel;
 (4) Appoint counsel for any unrepresented party under Juv. R. 4(A) who does not waive the right to counsel;
 (5) Inform any unrepresented party who waives the right to counsel of the right: to obtain counsel at any stage of the proceedings, to remain silent, to offer evidence, to cross-examine witnesses, and, upon request, to have a record of all proceedings made, at public expense if indigent.
 {¶ 34} As discussed above, Juv. R. 29 pertains to adjudicatory hearings. In re Williams, at ¶ 7; Juv. R. 29; see, also, Juv. R. 2(B) (defining "adjudicatory hearing" as "mean[ing] a hearing to determine whether a child is a juvenile traffic offender, delinquent, unruly, abused, neglected, or dependent or otherwise within the jurisdiction of the court").
 {¶ 35} Here, the adjudicatory hearing was held in September 2006 when the juvenile court adjudged C.M. and M.M. dependent children, as defined in R.C. 2151.04(C). FCCS's motion for permanent custody, on the other hand, was filed *Page 15 
pursuant to R.C. 2151.413 and 2151.414. Such proceedings are governed by Juv. R. 34. See Williams, at ¶ 7; Juv. R. 34(I) (providing in part that "[h]earings to determine whether temporary orders regarding custody should be modified to orders for permanent custody shall be considered dispositional hearings"); see, also, Juv. R. 2(M) (defining "dispositional hearing" as "mean[ing] a hearing to determine what action shall be taken concerning a child who is within the jurisdiction of the court").
 {¶ 36} Accordingly, because a hearing to modify temporary custody to permanent custody is a dispositional hearing, Juv. R. 29 is inapposite.In re Williams, at ¶ 8. Therefore, appellant's reliance on Juv. R. 29(B) in support of her second assignment of error is unavailing.
 {¶ 37} Moreover, to the extent that appellant may claim that the juvenile court prejudicially erred by failing to act in conformity with R.C. 2151.352, we disagree. R.C. 2151.352 provides in part:
 A child, the child's parents or custodian, or any other person in loco parentis of the child is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code. * * * If a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person. * * *
Cf. Juv. R. 4(A).[9] *Page 16 
 {¶ 38} In the instant case, appellant is not a parent or custodian of C.M. or M.M. And, although at different times in the past appellant may have been in loco parentis of C.M. or M.M., since February 2006 when the children were placed in foster care through FCCS, appellant had not been in loco parentis of the children. Thus, at the time of the hearing, appellant was not a parent or custodian, and appellant was not in loco parentis of the children. See, generally, State v. Noggle (1993),67 Ohio St.3d 31, 33, quoting Black's Law Dictionary (6 Ed. 1990) 787 (stating that "[t]he term `in loco parentis' means `charged, factitiously, with a parent's rights, duties, and responsibilities'"). Cf. Black's Law Dictionary (8 Ed. 2004) 803 (defining "in loco parentis" as, among other things, "[o]f, relating to, or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent").
 {¶ 39} "The rule is that when the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply the rules of statutory interpretation. * * * `In such a case, we do not resort to rules of interpretation in an attempt to discern what the General Assembly could have conclusively meant or intended in * * * a particular statute-we rely only on what the General Assembly has actually said.'" State ex rel. Jones v. Conrad (2001),92 Ohio St.3d 389, 392. (Citations omitted.)
 {¶ 40} Here, R.C. 2151.352 conveys a clear and definite meaning and provides in part that "[a] child, the child's parents or custodian, or any other person in loco parentis of the child is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code." R.C. 2151.352, however, does not provide in part that a child, the child's parents or custodian, or any other person in loco parentis of the child, or aperson who formerly had been in loco parentis of the *Page 17 child, is entitled to representation by legal counsel at all stages of the proceedings under R.C. Chapter 2152.
 {¶ 41} "When the meaning of the language employed in a statute is clear, the fact that its application works an inconvenience or accomplishes a result not anticipated or desired should be taken cognizance of by the legislative body, for such consequence can be avoided only by a change of the law itself, which must be made by legislative enactment and not by judicial construction." State ex rel.Nimberger v. Bushnell (1917), 95 Ohio St. 203, at paragraph four of the syllabus. "Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to rules of statutory interpretation. An unambiguous statute is to be applied, not interpreted." Sears v. Weimer (1944), 143 Ohio St. 312, at paragraph five of the syllabus.
 {¶ 42} Moreover, as the alleged error here involves a statutory right under R.C. 2151.352 — not a constitutional right — we cannot conclude that the juvenile court's oversight involves structural error. SeeState v. Colon, 118 Ohio St.3d 26, 2008-Ohio-1624, at ¶ 20 (explaining that "[structural errors are `constitutional defects that "`defy analysis by "harmless error" standards' because they `affect the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself'"`."). (Citations omitted); id. at ¶ 21 (stating that "`[i]n determining whether an alleged error is "structural," our threshold inquiry is whether such error "involves the deprivation of a constitutional right[.]"`* * * If an error in the trial court is not a constitutional error, then the error is not structural error"). (Citations omitted.) *Page 18 
 {¶ 43} Furthermore, absent any statutory definition of the term "party" in R.C. 2151.011, see, generally, R.C. 2151.011,[10] even if we were to construe the following statement in R.C. 2151.352 — "[i]f a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person" — to apply to appellant as the juvenile court made appellant a party prior the permanent custody hearing, we find that appellant failed to call the juvenile court's attention to its oversight at the beginning of the permanent custody hearing when the purported error could have been avoided.
 {¶ 44} "[A]n appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."State v. Glaros (1960), 170 Ohio St. 471, paragraph one of the syllabus. Accord State v. Williams (1977), 51 Ohio St.2d 112, at paragraph one of the syllabus, vacated in part on other grounds sub nom. Williams v.Ohio (1978), 438 U.S. 911, 98 S.Ct. 3137, approving and following.Glaros, supra. See, also, Sabouri v. Ohio Dept. of Job FamilyServ. (2001), 145 Ohio App.3d 651, 654, citing Kilroy v. B.H. LakeshoreCo. (1996), 111 Ohio App.3d 357, 363; Meyers v. First Natl. Bank (1981),3 Ohio App.3d 209, 210 (stating that "[i]t is well established thatpro se litigants are presumed to have knowledge of the law and legal procedures and that they are held to the same standard as litigants who are represented by counsel").
 {¶ 45} Because appellant failed to call the juvenile court's attention to its oversight at the beginning of the permanent custody hearing when the purported error could have *Page 19 
been avoided, we therefore conclude that appellant has forfeited this issue for purposes of appeal. See, e.g., State v. Payne,114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 22-23 (distinguishing concepts of waiver and forfeiture).
 {¶ 46} Although an appellate court need not consider an error that was not properly preserved for purposes of appellate review, an appellate court may, however, review in limited circumstances an issue otherwise forfeited using the plain-error doctrine. In re Wright, Franklin App. No. 04AP-435, 2004-Ohio-4045, at ¶ 15, citing In re Johnson, at ¶ 14.
 {¶ 47} "The plain error doctrine provides for the correction of errors clearly apparent on their face and prejudicial to the complaining party even though the complaining party failed to object to the error at trial." LeFort v. Century 21-Maitland Realty Co. (1987),32 Ohio St.3d 121, 124, citing Reichert v. Ingersoll (1985), 18 Ohio St.3d 220, 223;Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207, 209. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." State v. Moreland
(1990), 50 Ohio St.3d 58, 62, rehearing denied, 51 Ohio St.3d 704, certiorari denied, 498 U.S. 882, 111 S.Ct. 231; see, also, State v.Long (1978), 53 Ohio St.2d 91, at paragraphs two and three of the syllabus; State v. Barnes (2002), 94 Ohio St.3d 21, 27.
 {¶ 48} In Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, the Supreme Court of Ohio explained:
 Although in criminal cases "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court," Crim. R. 52(B), no analogous provision exists in the Rules of Civil Procedure. The plain error doctrine originated as a criminal law concept. In applying the doctrine of plain error in a civil case, reviewing *Page 20 
courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings.
Id. at 121, citing Schade, at 209; LeFort, at 124; Cleveland Elec.Ilium. Co. v. Astorhurst Land Co. (1985), 18 Ohio St.3d 268, 275.
 {¶ 49} Consequently, the Goldfuss court held: "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Id. at syllabus, approving and following,Yungwirth v. McAvoy (1972), 32 Ohio St.2d 285; Schade, supra, at 209; and Cleveland Elec. Ilium. Co., supra.
 {¶ 50} Applying this doctrine to the instant civil case, we cannot conclude that this is such an extremely rare case where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings. See In re Anderson (2001),92 Ohio St.3d 63, 65 (stating that juvenile court proceedings are civil, rather than criminal in nature); Cope v. Campbell (1964), 175 Ohio St. 475, paragraph one of the syllabus, overruled on other grounds in In reAgler (1969), 19 Ohio St.2d 70.
 {¶ 51} Here, the juvenile court did not fail to afford appellant any opportunity to present additional evidence or fail to afford appellant any opportunity to question *Page 21 
witnesses. Rather, the juvenile court did afford appellant some opportunity to provide additional testimony (Tr. Oct. 23, 2007, at 92), and the juvenile court also afforded appellant some opportunity to question witnesses. Id. at 109.[11]
 {¶ 52} Accordingly, to the extent that appellant has claimed that the juvenile court prejudicially erred by failing to act in conformity with R.C. 2151.352, we find such a contention is unpersuasive.
 {¶ 53} Besides the claims discussed above, appellant also challenges the juvenile court's finding that "[appellant] appeared without counsel, not qualifying for court appointed counsel." (Oct. 26, 2007Judgment Entry, at 1). Here, the record supports the juvenile court's finding that appellant appeared without counsel. Although appellant properly observes that the record does not contain any examination by the juvenile court *Page 22 
as to whether appellant qualified for court-appointed counsel, appellant fails to call our attention to any evidence in the record wherein appellant sought appointment of court-appointed counsel or wherein appellant informed the juvenile court that she was indigent and in need of court-appointed counsel. Appellant further fails to direct our attention to any evidence in the record suggesting that appellant should have been found qualified for court-appointed counsel. Based on evidence establishing that appellant was employed and recently had purchased a larger house to accommodate the potential addition of her two great-grandchildren to her home, the juvenile court reasonably could have inferred that appellant failed to qualify for a court-appointed counsel.
 {¶ 54} Accordingly, for all the reasons set forth above, we overrule appellant's second assignment of error.
 {¶ 55} By her third assignment of error, appellant contends that the guardian ad litem's failure to conduct a meaningful examination of the children's wishes may have resulted in an unconstitutional deprivation of counsel for the children.
 {¶ 56} "The duty of a lawyer to his client and the duty of a guardian ad litem to his ward are not always identical and, in fact, may conflict. The role of guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest. The role of the attorney is to zealously represent his client within the bounds of the law." In re Baby GirlBaxter (1985), 17 Ohio St.3d 229, 232, citing former DR 7-101; DR 7-102.
 {¶ 57} Here, relying in part on In re Williams (Mar. 20, 2001), Franklin App. No. 00AP-973, appellant contends that the children's guardian ad litem failed to meaningfully *Page 23 
examine the children's wishes. Williams, however, is factually distinguishable. We therefore find Williams is inapposite.
 {¶ 58} In Williams, this court found that the record in that case was devoid of reliable evidence about the wishes of a seven-year-old child, Cody. The Williams court stated:
 In the instant matter, the record is devoid of reliable evidence about Cody's wishes. The guardian ad litem did not testify about Cody's wishes or submit a report until after judgment was rendered. Cody did not testify about his own wishes. Cody's attorney testified, but he did not offer clear evidence about the wishes of this child. Although the attorney stated that Cody did not wish to live with appellant, the attorney also testified as to his own personal opinion about Cody's best interests. It is unclear in the record whether Cody actually told his attorney that he did not wish to live with appellant or if the attorney simply opined that Cody did not wish to live with appellant. In light of the ambiguity in his testimony, Cody's attorney failed to provide the judge with clear evidence about Cody's own wishes. Moreover, in providing personal opinion evidence about Cody's best interests, the attorney blurred the distinction between the role of the guardian ad litem and the role of an attorney advocate, doing violence to the very reason that the attorney was appointed in this case.
Id.
 {¶ 59} First, unlike Williams, here the guardian ad litem filed a report before the permanent custody hearing. And, in her report the guardian ad litem included a statement about the lay guardian ad litem's inquiry of C.M. as to where C.M. stated she wanted to live and the lay guardian ad litem's conclusion that M.M. had an inability to understand such an inquiry. The guardian ad litem's report also recommended granting permanent custody of the children to FCCS.
 {¶ 60} Second, unlike Williams wherein Cody was seven-years old, here, C.M. and M.M. were three-years old and two-years old, respectively, at the time that the guardian *Page 24 
ad litem filed her report. We find that such a difference in chronological age between the child in Williams and the children in this case is significant relative to an assessment of the children's maturity and capacity to voice their wishes as to custody issues. See, generally,In re Wright, Franklin App. No. 04AP-435, 2004-Ohio-4045, at ¶ 12
(stating that "[w]hen it is affirmatively demonstrated that a child is not capable or competent to communicate his or her wishes, a trial court is not required to assess the wishes of that child in determining whether permanent custody is in the child's best interest."); see, also,In re Salsgiver, Geauga App. No. 2003-G-2517, at ¶ 26-27.
 {¶ 61} Third, unlike Williams, here the lay guardian ad litem testified at the permanent custody hearing. At the permanent custody hearing Linda Chlapaty, lay guardian ad litem for C.M. and M.M., testified that she had visited with the children 58 times. (Tr. Oct. 23, 2007, at 5.) When asked whether she had been able to discuss the permanent custody proceeding with the children, Ms. Chlapaty testified: "I have asked [C.M.] where she would like to live and she told me — at that time, she said with mommy and she pointed to the foster mother. And [M.M.] is too young to really understand." Id. at 8. On cross-examination, when asked whether the children's foster mother was in the room when she asked CM where she wanted to live, Ms. Chlapaty testified: "She was in a far room, she was not in — she was not in close proximity to me." Id. at 15. Also, according to Ms. Chlapaty, when she made this inquiry of C.M., neither appellant nor D.M. were in the room. Id. at 15-16. When asked whether she thought C.M. would have pointed to D.M. if she were in the room, or whether she thought C.M. would have pointed to appellant if she were in the room, Ms. Chlapaty testified: "I don't think so." Id. at 16. When asked whether she thought that C.M. would have pointed to "whoever was the *Page 25 
adult in that area at that time," Ms. Chlapaty also testified: "I don't think so." Id. Ms. Chlapaty also testified that she had not discussed the issue of adoption with the children, and she also testified that "I don't believe they would understand that at the ages of four and two." Id. at 9.
 {¶ 62} When asked about her recommendation for these children, Ms. Chlapaty testified that she would recommend "P.C.C." Id. Ms. Chlapaty further testified that she did not have any reason to believe that her recommendation was contrary to the children's wishes. Id.
 {¶ 63} Under such facts and circumstances as these, we must therefore conclude that, unlike Williams, this record is not devoid of any reliable evidence of the children's wishes. Cf. In re Swisher, Franklin App. No. 02AP-1408, 2003-Ohio-5446, at ¶ 40.[12]
 {¶ 64} Furthermore, after reviewing the evidence, we also cannot conclude that in this case the juvenile court acted unreasonably, arbitrarily, or unconscionably by accepting the lay guardian ad litem's testimony and by failing to directly examine the children's wishes. "[A] trial court has discretion to accept the testimony of the guardian ad litem on the child's wishes rather than hearing a direct expression of those wishes made *Page 26 
by the child. The trial court should not be overruled absent a showing that the court acted in an unreasonable, arbitrary, or unconscionable manner." In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 56, reconsideration denied, 113 Ohio St.3d 1516, 2007-Ohio-2208, citingBlakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219 (defining "abuse of discretion").
 {¶ 65} Accordingly, for the reasons set forth above, we overrule appellant's third assignment of error, wherein appellant claims that the guardian ad litem failed to conduct a meaningful examination of the children's wishes, thereby possibly resulting in an unconstitutional deprivation of counsel for the children.
 {¶ 66} By her fourth assignment of error, appellant claims that the juvenile court's finding that it was in the children's best interest to be placed in the permanent custody of FCCS "was violative of Ohio Revised Code Section 2151.41(D)(3)(a) [sic] in that a compelling reason exists that permanent custody is not in the interests of the children" due to "the availability of a suitable relative, appellant Rosetta [J.]."[13] We construe appellant's fourth assignment of error as a claim that the juvenile court's award of permanent custody to FCCS is against the manifest weight of the evidence. In her fourth *Page 27 
assignment of error, appellant does not appear to assert a sufficiency-of-the-evidence claim.
 {¶ 67} "[I]n determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct." In re K.M.R., Franklin App. No. 07AP-191, 2007-Ohio-5012, at ¶ 8, citingBrofford, supra, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77. "`The underlying [rationale] of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" In re K.M.R., at ¶ 8, citing Seasons Coal Co., at 80; In re Abram, supra. Cf. Hartford Cas.Ins. Co. v. Easley (1993), 90 Ohio App.3d 525, 530 (stating that "[t]he standard for a review of the sufficiency of the evidence in a civil case is similar to the standard for determining whether to sustain a motion for judgment notwithstanding the verdict, which is whether the defendant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the prevailing party").
 {¶ 68} Here, to support its motion for permanent custody of the children, FCCS called the following witnesses: (1) Kelly Knight, a caseworker employed by FCCS; (2) D.M., as if on cross-examination; (3) Marvin J., as if on cross-examination; (4) appellant, as if on cross-examination; (5) Linda Chlapaty, lay guardian ad litem for C.M. and M.M; and (6) Tamika Jones, former FCCS caseworker for the M. family. Besides presenting testimony from these witnesses, FCCS also offered exhibits as evidence. *Page 28 
 {¶ 69} Kelly Knight testified that she was assigned to the M. case in June 2005 and, at the time of the transfer of the case to her, she reviewed the case and spoke with the previous caseworker and the caseworker's supervisor. (Tr. Oct. 22, 2007, at 13.) According to Ms. Knight, Jeremy H. is the alleged father of C.M., and Marvin J. is the father of M.M. Id. at 14.
 {¶ 70} Ms. Knight testified that FCCS removed the children from their home on January 10, 2006, after an order was issued by the juvenile court. Id. at 14-15. According to Ms. Knight, following their removal, C.M. and M.M. were placed with appellant from January 10 until February 14, 2006. Id. After the children were removed from appellant's home, C.M. and M.M. were placed in a foster care home where they have continuously resided. Id. At trial, Ms. Knight testified:
 The initial placement in Rosetta [J.]'s home as discussed with her was to be a short-term placement. As I previously stated, shared, we received custody at a court hearing, which was unexpected so we placed with Rossetta [J.] for a month. She had indicated that she would not be able to maintain her grandchildren long-term so we placed with them that day. We started to look for alternatives placement. Throughout that month, thought, Ms. [J.] indicated that she was having some significant behavior problems with the children's mother, D.M. [M.], who was visiting very often. * * *
 * * *
 Additionally during that time, there was [sic] concerns regarding the supervision of [D.M.] with her children. The Agency wanted [D.M.] to be supervised at all time with her children. [D.M.], herself, had reported that she was leaving Rosetta's home with her children and staying at friend's homes [sic]. So the basis of those items, we made the decision that we would be moving them to a foster home placement.
Id. at 17-18. *Page 29 
 {¶ 71} Ms. Knight also testified that FCCS "had had a long history with D.M. as a minor * * * and during that time she had a history of A.W.O.L.ing from a multitude of different placements. * * * D.M. had a history of A.W.O.L.ing, and * * * when she would A.W.O.L. that sometimes she would take her children with her and sometimes that she would leave them behind." Id. at 21-22. According to Ms. Knight, "[t]he majority of D.M.'s placement disruptions has — has been a result of her unruly behaviors in whatever home that she was residing in at the time. Many of her placement disruptions have resulted — have been a result of A.W.O.L.ing, which of course was direct not following the rules of that home. In addition, D.M. does have — has had charges placed against her of not following the rules of the community." Id. at 34.
 {¶ 72} Ms. Knight testified that, at the time of the permanent custody hearing, D.M. had failed to successfully complete parenting classes as required by the case plan, id. at 35-37; D.M. had failed to successfully complete counseling as required by the case plan, id. at 38; she had failed to maintain stable housing as required by the case plan, id. at 39-40; and she had only consistently attended school twice, between autumn of 2004 and spring of 2005 and in autumn of 2006. Id. at 39.
 {¶ 73} Ms. Knight testified that she did not "feel" that D.M.'s family had been "ultimately supportive." Id. at 42. According to Ms. Knight:
 [T]here has — there has been times where the family has indicated — you know, [D.M. and the children can — well we've placed those children back at home with either maternal grandmother or maternal great-grandmother. Those placements have not lasted long-term. They've not lasted long-term, there — there have been at times where they have not supported her and — you know, we want the children to be supervised with her and that was not supported. Our — we — [C.M.] was left behind and the next phone call was to *Page 30 
our Agency for us to come re — remove [C.M.], so they have not been supportive.
Id. at 42-43.
 {¶ 74} Ms. Knight further testified that, since January 10, 2006, D.M. had missed 69 of 89 scheduled visits with her children. Id. at 44-45. According to Ms. Knight, although D.M. resumed visiting the children in August 2007, she had been inconsistent in her visitations of the children. Id. at 45. And, according to Ms. Knight, at one point, D.M. had failed to visit her children for a five-month period. Id. at 46.
 {¶ 75} According to Ms. Knight, despite a diligent search to locate Jeremy H., the putative father of C.M., she had not had any contact with him, and Jeremy H. had not yet established paternity. Id.
 {¶ 76} Ms. Knight also testified that Marvin J. is the father of M.M. and, in August 2007, he submitted to a paternity test that confirmed he was M.M.'s father. Id. at 47. Ms. Knight testified that her contact with Marvin has been "sporadic." Id. Ms. Knight testified:
 * * * As I previously indicated, he had called me in early 2006 and indicated that he had been attempting to visit with [M.M.], but [D.M.] wasn't being truthful about where [M.M.] was. And I of course then explained to him that the children were under our custody and I scheduled an appointment to meet with him and I told him that I wanted him to come in and we'd review the case plan. He was a no show to that appointment. I then got another phone call on March 23rd [of 2006], he'd indicated at that time that he had a warrant; he wanted to wait and get his warrant taken care of prior to coming into talk with us.
 * * *
 And then May 10th of `06, we actually didn't have an appointment, we reviewed the case plan; we discussed the contents. We discussed the need for him to establish paternity.
 * * * *Page 31 
 And then most recently Marvin [J.] came into my office in June of 2007. It was an unannounced appointment, but I went down and met with him and once again discussed the fact that we needed paternity established. Prior to that time there had been missed paternity tests that I had scheduled for Mr. [J.], discussed with him that paternity still needed to be established. I set up an appointment with him later the next week, given the fact that he had popped in unannounced and I had other appointments and he was a no show for that appointment as well.
Id. at 47-48.
 {¶ 77} When asked whether Marvin had been offered visitation, Ms. Knight testified: "Yes. It was indicated that he was able to attend visits with Rosetta [J.] at the pre-trial in July. He had not attended then, I even spoke to him most recently again and said that — you know, that he had not been attending the visits, that if he came into the visit with Miss Rosetta [J.] at that time I would then schedule his own separate visitation. However, he did not attend that visit." Id. at 50. Ms. Knight further testified that Marvin J. had failed to attend visits that he was offered after July 2007. Id. at 51.
 {¶ 78} When asked whether Marvin had shown any interest in M.M., Ms. Knight testified: "Mr. [J.] has indicated to me that he does not feel that he is ready to have his — his child placed with him, but that he would be possibly interested in a relative obtaining custody of his child. He's indicated that he's not at this time in his life that he could handle raising his child." [sic]. Id.
 {¶ 79} Ms. Knight also testified that she did not believe that D.M., Jeremy, or Marvin had completed the services in the case plan to be reunified with the children. Id. at 52. *Page 32 
 {¶ 80} When asked whether appellant maintained throughout the case that she would like to be considered for legal custody of the children, Ms. Knight testified: "No, she has not maintained that throughout the duration of the case. As previously stated there has been times that Miss [J.] has indicated to me that she did not want to care for her grandchildren [sic] on a long-term basis. Ms. [J.] has indicated previous plans to move out of state. She's indicated that she did not want to raise her grandchildren [sic] and that she had plans to leave after she retired." Id. at 52-53. With respect to appellant, when asked whether she was in agreement with appellant's motion seeking custody of C.M. and M.M., Ms Knight testified that she was not. Id. at 52.
 {¶ 81} When asked whether appellant had been compliant with FCCS throughout the case, Ms. Knight testified:
 There have been times throughout the duration of this case that Miss [J.] has not wanted to be forthright regarding information regarding [D.M.] and [D.M.]'s whereabouts like her mother's address. Additionally, Miss [J.] first indicated to our Agency back in January of 2007 that she would like to have the children placed with her. We explained at that time that she would need to file a motion and — and what more than likely our Agency would be asked to do would be a home study and fingerprints. There has been some — several delays in getting the tasks accomplished that we've asked Miss [J.] to complete in order to be evaluated as a relative provider for the children.
Id. at 54-55.
 {¶ 82} Ms. Knight further testified that FCCS completed a home study in April 2007. Id. at 55. According to Ms. Knight, after the home study was completed, there were three issues that required additional attention, namely: (1) the proper storage of a gun within the home; (2) arranging different sleeping arrangements for C.M. in appellant's two-bedroom house so that C.M. would have her own bedroom or, alternatively, securing a *Page 33 
larger home that would allow C.M. to have her own bedroom, id. at 55-56; and (3) if alternative housing was not arranged, the installation of a monitoring system within the home that would allow appellant to monitor the children at night because the children's rooms would not be on the same level as appellant's room within the house. Id. at 56-57. FCCS also required appellant to identify an alternate caregiver for the children while appellant, who worked on the "second shift," was at work. Id. at 57.
 {¶ 83} Following this home study, appellant purchased a new home. Id. at 58. According to Ms. Knight, at the time of the hearing, appellant had resolved FCCS's housing concerns, and appellant had properly secured the gun within her home; however, according to Ms. Knight, the search for an alternate caregiver continued. Id. According to Ms. Knight, appellant previously had submitted the name of a potential caregiver, whom FCCS rejected due to this potential caregiver's extensive criminal history. Id. at 59. Ms. Knight further testified that a home study of appellant's new home was completed on September 28, 2007. However, according to Ms. Knight, a decision whether to approve or disapprove appellant's new home had not yet been issued at the time of the hearing. Id. at 93-94.
 {¶ 84} Ms. Knight also testified that appellant began to regularly visit C.M. and M.M. in January 2006. Id. at 60. According to Ms. Knight, although FCCS offered her two hours of visitation per week, appellant indicated that she only wanted one hour of visitation every other week. Id. at 62.[14] Ms. Knight further testified that appellant had been offered 33 visits, and appellant has missed seven of these scheduled visitations. Id. *Page 34 
 {¶ 85} When asked whether she believed that appellant had shown that she was genuinely interested in having custody of C.M. and M.M. on a long-term basis, Ms. Knight testified:
 [Rosetta J.] has indicated to me on occasions that her — her-she would like to be able to have the children placed with her to give [D.M.] more time that she thinks that [D.M.] at some point will be able to get her life in a way that she'll be able to have her children. [D.M.] herself has maintained that — you know, she wants her grandmother to obtain custody of the children because she hopes to have at some point to get her life to the point where she could be able to parent her children full-time.
Id. at 63.
 {¶ 86} On direct examination, Ms. Knight also testified that, in the past appellant had an open case with FCCS with regard to her own children, id., and appellant's children also had open cases with FCCS. Id. at 63. When asked whether this family history concerned her, Ms. Knight testified: "It does concern me. There's been a family history of having open cases with — throughout the family, throughout the generations." Id. at 63-64. On re-cross examination, Ms. Knight testified:
 There was [sic] open cases regarding both her daughters. Of which one would be Miss [M.]'s mother and then would be Miss [M.]'s aunt. Those cases were open approximately I think the longest time they were open was a span of approximately two to three years due to unruly/delinquent issues of her daughters. * * * [D.M.]'s mother, Veda [M.], has had an open case with our Agency due to alcohol and drug issues. Miss [J.] had an open case as a mother herself due to unruly/delinquent issues of her teen daughters at that time.
Id. at 125. When asked whether these old cases indicated any neglect or abuse on Ms. J.'s part, Ms. Knight testified: "What it indicated was that she was wanting to relinquish custody due to unruly and delinquent issues. Case notes did indicate that she — at one *Page 35 
period went for a period without wanting to visit with her daughter and that she was not compliant with some of the counseling and treatment recommendations regarding her children." Id. at 126. When asked whether it concerned her that appellant had asked to relinquish her own children as well as D.M., Ms. Knight testified:
 Yes, it does.
 * * *
 There appears to be a pattern of when the children reach the age of their adolescent years that Miss [J.] has been unable to consistently parent them and provide the consequences that they need to be able to be maintained in her home. That is concerning when we are here today discussing — you know, long-term permanency for two young children. It would be unfortunate if 10 years from now, we're back in the courtroom regarding what is perceived as unruly behavior on the — you know, the children's part. But especially with children becoming as unruly as young as [D.M.] did at age 12, some of that is a bi-product of how they've been parented and the environment they've grown up in.
Id. at 127-128.
 {¶ 87} Ms. Knight testified that, at the time of the permanent custody hearing, C.M. and M.M. had been in their current placement for 20 months, which was the longest period of time that the children had been in one place; the current foster family was a potential adoptive family; and C.M. and M.M. were bonded with their foster mother, whom they called "Mom and mommy," and to their foster siblings. Id. at 67-68. Ms. Knight also testified that the children recognized D.M., but that she did not think the children were "severely attached" to their mother. Id. at 68. Ms. Knight further testified that she had not observed the children with either of their biological fathers because these men had not *Page 36 
attended visits with the children. Id. When asked whether the children appeared "bonded" to appellant, Ms. Knight testified:
 They know Rosetta. They — they go to the visits with Rosetta, they feel comfortable with her. It's hard to gage [sic] how severe that attachment is since it's just visitation once weekly. There's no notes of behavior problems or emotional issues after they leave the visits. [M.M.] often has issues actually leaving his foster home for visits, the disruption of having to be transported by someone into our office. But he's usually fine once he gets to the office.
Id. at 68-69.
 {¶ 88} On direct examination, Ms. Knight also testified as follows:
 Q. And you've had indication from both [D.M.] and Rosetta that this not a long-term plan if Rosetta does receive legal custody?
 A. The indication has been that the hope is that [D.M.] will eventually — you know, complete the things on her case plan or get to a point in her life where she could assume full responsibility for her children.
 Q. And does this concern you?
 A. Yes, it does.
 Q. Why?
 A. It's concerning because I — I worry that there will not be an adequate judgment made if [D.M.] has actually completed her case plan activities. I don't know if the same importance will be placed on some of her activities that our Agency has requested of her to be able to parent her children.
Id. at 69.
 {¶ 89} When questioned whether appellant in the past had shown an ability to supervise the children appropriately with D.M., Ms. Knight testified: "Our Agency has had concerns that resulted in removal of the children regarding her ability to monitor D.M.'s *Page 37 
contact with her children. There's also been concerns regarding the fact that several times custody's been relinquished to us of D.M. because of her unruly behavior because Rosetta's been unable to manage it and that's concerning if she's unable to manage D.M.'s behavior around her children." Id. at 70.
 {¶ 90} When asked her recommendation for the children, Ms. Knight testified that "I'm recommending that they be placed for a permanent commitment for the purposes of adoption." Id. at 70-71.
 {¶ 91} On cross-examination, Ms. Knight testified that, for the duration that she has been involved with appellant, a school-aged grandchild has lived with appellant. Id. at 97. When asked whether there have been any concerns regarding this grandchild, Ms. Knight testified: "* * * [W]e have not had an open case on that grandchild that I've been involved on so I — I can't speak any further than that." Id. at 98. Ms. Knight further testified: "We have a case history with the grandchild's mother, but I was not the assigned caseworker for that case." Id.
 {¶ 92} On cross-examination, when asked whether it would be fair to state that for most of C.M.'s life she spent time with D.M. or with D.M. in the presence of other relatives, Ms. Knight testified: "There's been extended periods of time in [C.M.'s] life where she's been with her mother or relatives, most often under the custody of her mother with a relative." Id. at 103.
 {¶ 93} On cross-examination, when asked whether there has been a sense of bonding between D.M. and her children, Ms. Knight conceded that there have been "gestures" where the children indicated that they loved their mother and grandmother. Id. at 104. *Page 38 
 {¶ 94} On cross-examination, when asked whether C.M. or M.M. had any serious physical health problems while they were in the custody of D.M. or other relatives, Ms. Knight testified:
 The one serious physical health problem that the children have had is [C.M.] had to have four of her upper teeth pulled and that was a result — the dentist indicated as a result of what is commonly referred to sometimes as "bottle rot." So those were pulled, those were pulled while she was in foster care, however; the damage was done throughout the duration of her first year and then on from there.
Id. at 112.
 {¶ 95} When asked whether the children ever showed physical manifestations of abuse, such as broken bones, Ms. Knight testified: "There's never been any incidences of major broken bones to these children." Id. at 113. When asked whether she was aware of any major trauma, Ms. Knight testified: "The only other incident would be that [C.M.] returned from a visit, an un — a visit with her mother, to her family here in Columbus with a severe diaper rash. A diaper rash that was bad enough that the doctor indicated it was one of the worst ones he had see, but nothing beyond that." Id. at 113. Ms. Knight further testified: "D.M. was placed in foster care and had her children placed in the same foster home as her and they went on a weekend visit. It was upon the return from that visit that the diaper rash was determined[.]" Id.
 {¶ 96} When asked whether the children exhibited any developmental delays, Ms. Knight testified:
 There was a concern at one point * * * regarding [M.M.'s] — his weight and height for his age, however; that was never — it never grew into a full blown concern, it was just something we monitored. [C.M.], as I said, has had some treatment done for her teeth. We are working to get her what's called a groper, it fill in her four teeth and that's for self-esteem *Page 39 
reasons as well as speech therapy * * * And then we are currently evaluating [C.M.] because of some of her issues — her attention span and her duration of how to get her to bed at night, however; there's been nothing out of that that's been identified as a major developmental problem.
Id. at 114.
 {¶ 97} On cross-examination, Ms. Knight also testified that M.M. had been bitten by a dog while he was in foster care. Ms. Knight testified:
 [M.M.] * * * had a incident with a dog while he was * * * under the care of his foster parent, however; he was in an alternative caregiver provider's home, a babysitter's home that was approved through the foster care agency. It was a small dog. * * * He received immediate medical attention. The foster parents followed through with all of the necessary procedures and * * * the incident was reported to us. * * * [T]hat babysitter home is no longer being utilized by the foster care agency.
Id. at 117.
 {¶ 98} Besides calling Kelly Knight to testify on its behalf, FCCS also called D.M., as if on cross-examination, to testify on its behalf. When asked about her understanding as to why the court removed her children, D.M. testified: "Because I wasn't going to school and I was unruly." Id. at 131-132. When asked about her understanding as to what she needed to do to have her children returned to her, D.M. testified: "Go to school and go to my parenting classes and go to counseling, which I completed by parenting classes, but I left my parenting certificate at home." Id. at 132.
 {¶ 99} D.M. denied that she had stayed with her mother when she has absconded from a placement. Id. at 134-135. However, when asked whether she had been observed at her mother's house while absent from a placement without permission, D.M. *Page 40 
testified that "[w]ell that only happened once and I just went over there because I needed to use the bathroom and I was right around the corner from her house." Id. at 135.
 {¶ 100} When asked whether she thought her children had stability if she left them or absconded with them, D.M. testified: "No, but like if I left them with my grandmother or my mom and I A.W.O.L.'d they would still be taken care." Id. at 136.
 {¶ 101} When asked whether she believed she was fully prepared to parent her children even though she admitted that she failed to complete portions of her case plan, D.M. testified: "Yes, I feel like I'm ready." Id. at 141. D.M. also testified that, at the time of the hearing, she was enrolled in Columbus State Community College, where for aproximately two to three weeks she had been pursuing a G.E.D. Id. at 142-143. According to D.M., prior to studying at Columbus State Community College, she had attended a charter school for two to three months, and for about eight months she "was working on getting a job," although she conceded that during this eight-month period she had not been employed. Id. at 143-144. When asked what she was going to do following completion of her G.E.D., D.M. testified: "I'm gonna be a nurse." Id. at 145. Also, when asked whether she foresaw her grandmother having custody of her children while she pursued a nursing degree, D.M. testified: "I see myself getting my kids when I'm done with nursing school." Id. at 156-157.
 {¶ 102} When asked whether, at that time, she could provide a stable place for her children to live, D.M. testified: "I can't, but my grandmother can so therefore; yes, I do." Id. at 146. D.M. further testified that she was asking the court to grant custody of her children to appellant, her grandmother, and not to herself, the children's mother. Id. at 146-147. D.M. testified: *Page 41 
 Q. So are you asking for the Court to give you custody or are you asking for the Court to give your grandmother custody?
 A. My grandmother custody.
 Q. So you don't think that you can parent your children right now?
 A. No.
 Q. Even though you indicated to me just a couple of minutes ago you could?
 A. I could if I was to get `em, but I'm not ready to get `em I feel that my grandma should get `em.
Id.
 {¶ 103} At one point, D.M. also testified:
 Q. And do you think that if your grandma gets them that you will eventually be able to get your life together and you'll be able to take them?
 A. [By D.M.] Yes.
 Q. And that's what the plan is?
 A. Yes.
 Q. Do you believe that your grandmother will give you custody back of them someday if you get your life together?
 A. Yes.
Id. at 147.
 {¶ 104} At the hearing when asked why she absconded from her foster placement with her children, D.M. explained that she believed her foster mother "was showing favoritism over her kids and mine. She — her — she — she was choosin' her kids over my kids. She really didn't care about my kids as long as she was gettin' the money." Id. at 153. *Page 42 
 {¶ 105} At the hearing, D.M. claimed that she had recently resumed visitation of her children, but she was unable to state "around what month it was" that she resumed visitation. Id. at 156. D.M. did, however, testify that a five-month period had elapsed when she did not visit her children. Id.
 {¶ 106} On direct examination, D.M. reiterated her earlier testimony that, if her children were not placed with her, she would want them placed with appellant because she thought it was in the children's best interests. (Tr. Oct. 23, 2007, 94-95.)
 {¶ 107} Besides calling Kelly Knight, and D.M., as if on cross-examination, to testify on its behalf, FCCS also called Marvin J., M.M.'s father, as if on cross-examination, to testify at the permanent custody hearing.
 {¶ 108} Marvin testified that he was 19-years old, and that he had his own house. (Tr. Oct. 22, 2007, at 159.) Marvin further testified that M.M. had never lived with him. Id. at 160. Marvin also testified that he underwent a paternity test in September 2007, id. at 161, and further testified that he failed to attend previously scheduled paternity tests because a taxicab, which FCCS purportedly had agreed to send to transport him to these appointments, failed to arrive. Id. at 161-162.
 {¶ 109} Marvin testified that he had not visited his son since he was granted visitation by the court in July 2007. Id. at 163-164. Marvin also testified that he saw his child daily for about three to four months following his son's birth. Id. at 165. Later, Marvin clarified that for a period of "three or four months" "I seen him daily like he would be up at Miss Rosetta's then she would bring him by my grandma's and I would spend time with him like on the weekends and some days on the week days." Id. at 171. Marvin also testified that when M.M. was placed with D.M., after having been cared for in *Page 43 
foster care, he "started seeing him occasionally on a daily basis." Id. at 172. However, on recross-examination, counsel for FCCS challenged Marvin's testimony that he saw his son during his son's first three months of life because his son was in foster care at that time. Id. at 178-179.
 {¶ 110} Marvin testified that, in the past, he had left messages for Ms. Kelly Knight, but she had not returned his phone calls. Id. at 168. When asked if he had a case plan, Marvin testified: "No, I ain't never heard nothin' about no case plan." Id.
 {¶ 111} When asked whether he preferred to have his son move in with himself, with D.M., or with appellant, Marvin testified: "I mean, that's my son, so really I'd prefer him to move in with me." Id. at 169. Marvin further testified that he was willing to have his son, as well as his son's half-sister, reside with him. Id. at 170.
 {¶ 112} When asked if he would be opposed to the court's granting custody of his son to appellant if his son could not be placed with D.M. or himself, Marvin testified that he thought that it would be in his son's best interest to be placed with appellant. Id. at 173-174. Marvin also testified that his son has developed a relationship with his mother, sisters, brothers, cousins, and his grandmother. Id. at 174-175.
 {¶ 113} On direct examination, Marvin testified that he is a high school graduate and, at the time of the permanent custody hearing, he was unemployed. (Tr. October 23, 2007, at 81.) According to Marvin, he previously had worked at a Tim Horton's restaurant for one year. Id. at 82. According to Marvin, if he were awarded custody of M.M. he would get a job and M.M. and his half-sister would live with him and appellant. Id. On direct examination, Marvin reiterated his earlier testimony that he would agree to placement of M.M. and his half-sister with appellant. Id. at 82-83. Marvin also testified *Page 44 
that his extended family was interested in M.M. and his family was interested in having M.M. as part of the family. Id. at 86.
 {¶ 114} FCCS also called appellant, as if on cross-examination, to testify on its behalf. Appellant testified that she is the maternal grandmother of D.M. . (Tr. Oct. 22, 2007, at 180.) According to appellant, in the past she held legal custody of D.M. . Id. at 180-181. Although appellant was unable to pinpoint how many years of D.M.'s life that D.M. lived with her, appellant testified that "[D.M.'s] been back and forth between me and her mother. * * * I think I had her the most years when she was younger." Id. at 181-182.
 {¶ 115} Appellant testified that she has three adult children: two daughters and one son. Id. at 183. Appellant testified that, when her children were teenagers, FCCS may have had open cases concerning her children. Id. at 183-184. When asked whether her daughters were delinquent as minors, appellant testified: "When they were ages of 16 and 17 probably; yeah." Id. at 184. When asked whether it would be fair to state that her family has been involved with FCCS for many years, appellant testified: "Well I guess you could say that." Id. at 187.
 {¶ 116} Appellant testified that for the past six years she has had custody of a six-year-old grandson who was born drug dependent. Id. at 185. When asked whether she had informed a former caseworker shortly after C.M.'s birth that she intended to retire within two years and move to Arizona, appellant denied having made such a statement. Id. at 188. Appellant did, however, testify that "the person that I mentioned that to was Kelly Knight and what I said to her that my plan in life was sometime to move out of the state. * * * When I retired. But since I have bought a home now that has since not gonna be." Id. *Page 45 
 {¶ 117} Appellant testified that she did not recall how long C.M. and M.M. lived with her before they were removed from her home. Id. at 188-189. However, appellant later testified that she "thought she had `em about a year or so" after the children were born. Id. at 190. Appellant further testified:
 * * * But I do remember that when they were placed there I had got a call from Children Services, who was probably Kelly Knight, and she said that she was removing the children from her mother's home and they needed a temporary place for them, could I take them. But this would only be temporary and I took [D.M.] and — and [C.M.], the two kids. During that time they were in the place of finding a place for those children.
 * * *
 So come to find out that [D.M.] in the meantime of process, found [D.M.] wasn't going to school.
 * * *
 You know, and she wasn't coming back in like she was supposed to. So Kelly Knight come to the house and she said that they had found a placement for the children and they would be removing all three and then we talked about [D.M.] being unruly and not going to school and blah, blah this and so she said she would definitely be placing her. So I said to her then, I said the children are no problem.
 * * *
 [D.M.] is the problem here. Kelly Knight said to me, well what we decided to do was to place all three of `em together in a home.
Id. at 189-190.
 {¶ 121} When asked whether she had some issues with her children and grandchildren after they became teenagers, appellant answered affirmatively. Id. at 197. And, when asked whether she feared that these "issues' would come up with C.M. and *Page 46 
M.M. when they became teenagers, appellant testified: "I can't — I can't look into the future like that so." Id. at 197. Also, when asked when she changed her mind about caring for C.M. and M.M. on a full-time basis, appellant testified: "When I seen that their mother doesn't seem that she was trying to do the right thing and I decided to say that me as a family member and a grandmother who loves `em should stand up for `em." Id.
 {¶ 119} When asked whether, Tony L, a "family friend," had a rather lengthy criminal history, appellant testified: "I don't know his lifestyle, but I do know that he had problems in the past according to him. But I know a lot of it was throwed * * * out `cause I checked." Id. at 199. When asked whether Tony L. would have access to C.M. or M.M., appellant testified: "Well family friends come around." Id. Appellant further testified: "He's been around since [C.M.'s] been born. You know, he knows the kids." Id. Appellant also testified: "He's never lived in my home; he's just a family friend. He comes there; he does work for me around the house. He's always — you know we used to date back in the day. * * * I would say two years ago. * * * A year and a half." Id. at 214-215. When asked whether she was concerned that Tony had a criminal history, appellant testified: "Well you know people have problems and things in life that happen. * * * And they do try to change and he is a totally different person these days — you know, as a friend and a family and everything. I had a lot of friends that has problems, but I don't go around checkin' all their history." Id. at 203-204.
 {¶ 120} When asked whether she thought it would be in C.M. and M.M.'s best interest to be removed from their current home and placed with her, appellant testified: "Because I think a child needs to be with a stable family." (Tr. October 22, 2007, at 205.) When asked if she intended to raise C.M. and M.M. until they were grown, appellant *Page 47 
testified: "Yes, it is." Id. at 205. Appellant denied that it was her intention to allow her granddaughter to take custody of C.M. and M.M. Id. at 205-206. Appellant testified: "My intentions is to raise them as long as I can until they become grown or until D.M. gets herself together and finally get a husband and a life." Id. at 206.
 {¶ 121} When asked whether C.M. or M.M. recognize appellant during visitation, appellant testified in the affirmative. Id. at 212. Appellant further testified that her great grandchildren had inquired about when they might go home with her, and her great grandchildren also tell her that they love her. Id. at 212-213.
 {¶ 122} Appellant testified that she had recently bought a four-bedroom house because she had been informed by FCCS that she would need a larger house if her great-grandchildren were to live with her. Id. at 209; 214. Appellant also testified that, although she is employed as a "third shift" worker, she has arranged for childcare assistance through family and a family friend. Id. at 217-219.
 {¶ 123} On direct examination, besides clarifying earlier testimony, appellant also reiterated her desire to have custody of C.M. and M.M. (Tr. Oct. 23, 2007, at 90-91.) When asked about her plans for retirement, appellant testified: "When I retire if I decide to stay here in Columbus, Ohio or decide to move to Arizona; I would plan on taking [her great-grandchildren] with me." Id. at 91.
 {¶ 124} Linda Chlapaty, lay guardian ad litem for C.M. and M.M., testified that she had visited with the children 58 times. Id. at 5. Ms. Chlapaty testified that C.M. had been in four placements since she has known her, and M.M. had been in three placements since she had known him. Id. at 6. Ms. Chlapaty further testified that she had the opportunity to visit the children in each of these placements. Id. *Page 48 
 {¶ 125} When asked whether she would be in support of having C.M. and M.M. placed with appellant, Ms. Chlapaty answered in the negative. Id. When asked why she would not be in support of such an arrangement, Ms. Chlapaty testified: "The children are bonded with the foster family. [C.M.] told me a few months ago that she was going to be going to live with Cree and grandma. And I asked her who told her that and she told — she said that Cree told her that." Id.
 {¶ 126} Ms. Chlapaty testified that she had an opportunity to observe the children with appellant. Id. at 6-7. Ms. Chlapaty testified: "I saw the children [C.M.], on more than one occasion walking around the house carrying a large bag of chips eating it freely. I observed on an occasion or two in the wintertime the children were only wearing a diaper and T-shirts. There were not a lot of age appropriate toys that I observed. I observed that [C.M.] and D.M. (sic) did not sleep in their own beds when they were in the home rather they slept with their mother." Id. at 7.
 {¶ 127} Ms. Chlapaty also testified that she had an opportunity to observe the children in their current placement and further testified that the children were bonded to the foster family and to each other. Id.
 {¶ 128} Ms. Chlapaty testified that she had an opportunity to observe the children with their mother. Id. When asked whether the children were bonded with their mother, Ms. Chlapaty testified: "They enjoy playing with her, but if they're — if somebody else is in the room they will also play with that person or they might go off and play by themselves. They don't appear to cling to her." Id. at 7-8.
 {¶ 129} Ms. Chlapaty also testified that she had an opportunity to observe the children with appellant. Id. at 8. When asked whether the children were bonded with *Page 49 
appellant, Ms. Chlapaty testified: "[T]hey enjoy playing with — with Miss Rosetta [J.]. They are engaged when they are with her. She always takes juice and chips for them to eat. But I don't again see any clinging. Just last Friday when I was at a visit as the children were leaving they were very happy to go to the transporter; [C.M.] ran to the transporter and hugged the transporter. So there was no crying or tears at separation." Id. On cross-examination, Ms. Chlapaty testified that she had not visited Marvin J.'s home at any time when he had visitation of the children. Id. at 19.
 {¶ 130} When asked whether she had been able to discuss the permanent custody proceeding with the children, Ms. Chlapaty testified: "I have asked [C.M.] where she would like to live and she told me — at that time, she said with mommy and she pointed to the foster mother. And [M.M.] is too young to really understand." Id. at 8. On cross-examination, when asked whether the children's foster mother was in the room when she asked [C.M.] where she wanted to live, Ms. Chlapaty further testified: "She was in a far room, she was not in — she was not in close proximity to me." Id. at 15. According to Ms. Chlapaty, when she made this inquiry of C.M., neither appellant nor D.M. were in the room. Id. at 15-16. When asked whether she thought C.M. would have pointed to D.M. if she were in the room, or whether she thought C.M. would have pointed to appellant if she were in the room, Ms. Chlapaty testified: "I don't think so." Id. at 16. When asked whether she thought that C.M. would have pointed to "whoever was the adult in that area at that time," Ms. Chlapaty also testified: "I don't think so." Id.
 {¶ 131} Ms. Chlapaty also testified that she had not discussed the issue of adoption with the children and further testified that "I don't believe they would understand that at the ages of four and two." Id. at 9. *Page 50 
 {¶ 132} When asked about her recommendation for these children, Ms. Chlapaty testified that she would recommend "P.C.C." Id. Ms. Chlapaty further testified that she did not have any reason to believe that her recommendation was contrary to the children's wishes. Id.
 {¶ 133} On cross-examination, Ms. Chlapaty testified that she had concerns about appellant's ability to ensure that C.M. and M.M. would attend school in the future. Id. at 10. Ms. Chlapaty testified: "Miss [J.], Miss Rosetta [J.] told me that she was unable to make D.M. go to school. So I have concerns if she's unable to make D.M. go to school, will she be able to make the children go to school." Id. On cross-examination, when asked about observing C.M. with a bag of chips at appellant's home, Ms. Chlapaty testified that she visited appellant's home "probably three or four" times and she observed C.M. with a bag of chips on more than one occasion. Id. at 11-12. Ms. Chlapaty further testified that she considered it inappropriate to allow a two-year-old child to eat an unlimited amount of chips. Id. at 12. Ms. Chlapaty further testified that she did not observe any person "saying you can't have those, you've had enough; put those away." Id. On cross-examination, Ms. Chlapaty was also questioned about her definition of "bonding." Id. at 12-14.
 {¶ 134} FCCS also called Tamika Jones to testify on its behalf. Ms. Jones, a licensed social worker who is employed by FCCS, testified that she formerly was an assigned caseworker for the M. family from April 2003 until June 2005. Id. at 25. Ms. Jones testified that, at appellant's request, she removed D.M. and C.M. from appellant's home. Id. at 26. Ms. Jones testified: "At one point during the placement, I can particularly remember one conversation I believe she was kind of upset with D.M.'s behaviors and *Page 51 
she made the comment that she would be retiring in two years and she had no intention of taking children with her." Id. at 27.
 {¶ 135} When asked whether she had any concerns when D.M. and C.M. were placed with appellant, Ms. Jones testified:
 Honestly I felt like she overall provided good care to the children, the concern that I did have was her response to [D.M.] in as far as taking care of the baby. It was more so-you know, I'm tired of [D.M.]'s behavior, she's made this mistake; it's on her.
 * * *
 Yeah, there was actually one conversation had taken place where she made * * * and this is probably not verbatim * * * She made the comment well — you know, who's gonna babysit while she goes to school. You know, I'm not puttin' my life on hold again for [D.M.] anymore, she made the mistake and she needs to realize she messed up.
Id. at 27-28.
 {¶ 136} When asked whether she thought appellant provided a stable home for D.M. and C.M., Ms. Jones testified: "I think she provided a stable home while they were in the home, but there was just the incidents of — you know, when D.M. acted out it was okay, you need to come get her." Id. at 28. On cross-examination, Ms. Jones also testified: "[T]he children always had clothing, always — you know, for the most part food. I think there was one incident where Rosetta or Rosetta through Veda asked for cans of milk for [C.M.], but overall — you know they had food, clothing; the home was always clean. * * * [N]ot like a lot of chaos. You know, not a whole lot going on in the home other than D.M.'s behavior." Id. at 29.
 {¶ 137} At the hearing, in her defense, besides calling herself, appellant, and Marvin J. to testify, D.M., the children's mother, called these witnesses to testify on her behalf: (1) *Page 52 
Renee Thompson, a childcare provider; (2) Victoria Lewis, an FCCS employee, as if on cross-examination; and (3) Erin Tebben, an FCCS employee, as if on cross-examination. D.M. also offered exhibits as evidence.
 {¶ 138} Renee Thompson testified that she has been employed as a childcare provider for approximately 11 years. Id. at 33. Ms. Thompson also testified that she "[had] a license with Franklin County and [she] also [had] license with Action for Children under their program, their food program," id. at 34, and that she was a "Title 20 qualified" childcare provider. Id. at 36. According to Ms. Thompson, she has known appellant for over 30 years. Id. at 37.
 {¶ 139} Ms. Thompson testified that she had discussed babysitting duties with appellant. Id. at 38. According to Ms. Thompson, she informed appellant that she was available to provide childcare for appellant's great-grandchildren during the hours that appellant sought, and she provided appellant with paperwork to determine appellant's eligibility for Title 20 assistance, which apparently provides eligible clients with financial assistance for childcare. Id. at 37-39. Ms. Thompson, however, testified that she did not know whether appellant had qualified for Title 20 assistance. Id. at 41-42.
 {¶ 140} Victoria Lewis, an employee of FCCS who supervised two visits for the M. family, testified that she had never met D.M., but she was familiar with appellant, and C.M. and M.M. Id. at 44-45; 57. Ms. Lewis further testified that she had an opportunity to observe C.M. and M.M. interact with appellant. Id. at 45. When asked how the children acted when they were with appellant, Ms. Lewis testified: "They're happy, they play with the — the toys, they play with grandma [sic] and they're usually happy throughout the visit." Id. at 45. Ms. Lewis further testified: "* * * [T]hey say I love you back and forth *Page 53 
between Rosetta and the children and they give hugs throughout the visit. * * * They've stated that they love each other and that [C.M.] has stated that she misses her grandma [sic]. And I think once she said don't forget about me and yeah, that — she said that she missed her and that she loved her so." Id. at 45-46. When asked whether C.M. and M.M. appeared "bonded" to appellant, Ms. Lewis testified: "Yes, they did." Id. at 56.
 {¶ 141} Erin Tebben, a social service aide with FCCS, testified that she was familiar with C.M. and M.M. and observed about ten visits between D.M. and her children. Id. at 60. When asked how the children acted during visits with their mother, Ms. Tebben testified: "It depends on how long Miss [M.] has been visiting. At first [C.M.] is usually very happy to see her mom she will run and greet her and they normally spend quite a bit of time hugging each other. [M.M.] will usually hang back and he'll follow [C.M.]'s lead after a bit of time." Id. Ms. Tebben further testified:
 [C.M.] will frequently say I love you mommy; [M.M.] has done it probably three or four times. * * * [C.M.] says mommy, after the first — usually for the first visit actually well, when Miss [M.] started visiting again in February, the first couple of weeks; she was calling her [D.M.]. After that, Miss [M.] didn't appear for a visit, [C.M.] asked where [D.M.] was. She didn't say where's mommy she said where's [D.M.] we need to go find her she's hiding and she kind of does refer to her as mommy.
Id. at 60-61.
 {¶ 142} Ms. Tebben also testified that she saw the children interact with appellant. Id. at 61. When asked how the children acted with appellant, Ms. Tebben testified: "They are affectionate kids; they're very friendly for the most part. [C.M.] will give hugs voluntarily; [M.M.] usually needs to be asked to give hugs and kisses when it's time to leave or when Miss [J.] first arrives they normally — she normally asks [M.M.] for hugs and kisses; [C.M.] will usually give them voluntarily." Id. When asked whether she felt *Page 54 
the children were "bonded" to appellant, Ms. Tebben testified: "I honestly am not sure how to define bonding." Id. at 71. When asked what her definition of bonding was, Ms. Tebben testified: "From other visits that I've seen where children are, what I would consider bonded, they seem upset when the parent or caregiver leaves * * * the visit at the end of the visit. They tend to have difficulty letting the person leave. They seem very excited when the person arrives and they want to spend the majority of their visiting time with the person who's visiting." Id. When asked whether the children were excited to see appellant, Ms. Tebben testified: "[C.M.] I would say on most occasions is excited to see Rosetta. [M.M.] sometimes is, sometimes is not." Id. Ms. Tebben also testified that, according to her recollection, D.M. failed to visit her children from March until July, 2007. Id. at 74.
 {¶ 143} Here, bearing in mind the juvenile court's superior, first-hand perspective in judging the demeanor and credibility of witnesses, see, In re K.M.R., at ¶ 8; see, also, State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus, we cannot conclude that some competent credible evidence does not support the juvenile court's judgment, or that some competent, credible evidence does not support the juvenile court's finding that "[t]he children would be caused too much sacrifice to separate from the certain stability of their foster placement to be placed in the care of their great-grandmother and experience the likelihood of a significantly less nurturing stimulation and stable experience with the great-grandmother." (Judgment Entry, at 2.)
 {¶ 144} Here, despite appellant's care and custody of a six-year-old grandchild, appellant's purchase of a larger home to accommodate her great-grandchildren and appellant's apparent devotion to C.M. and M.M., since February 2006, C.M. and M.M. *Page 55 
have lived in the same foster care placement, which has afforded them stability, constancy, and reliability. Removing the children from such an environment and permanently placing them with appellant likely would disrupt, even if only temporarily, the stability, constancy, and reliability the children enjoyed in their foster care placement.
 {¶ 145} Moreover, although appellant has demonstrated an ability to care for a six-year-old grandson, appellant's concession that her own daughters were delinquent minors when they were 16 or 17-years old (Tr. October 22, 2007, at 184), and her concession that she had some issues with her children after they became teenagers, id. at 197, support a reasonable inference that, for whatever reason, appellant's ability to care for minors during their adolescence historically has been problematical. And, while on the one hand, appellant's agreement that it was a fair characterization that her family has been involved with FCCS for many years, id. at 187, may be viewed as a strength because it demonstrates appellant's willingness to seek outside assistance in times of family crises, such involvement by FCCS also reasonably may be viewed with uneasiness, especially when considered with appellant's concession that she had some issues with her children and grandchildren after they became teenagers. We therefore cannot conclude that the juvenile court erred when it found the children had a "likelihood of a significantly less nurturing stimulation and stable experience" with appellant.
 {¶ 146} For the foregoing reasons, we therefore disagree with appellant's contention that the juvenile court prejudicially erred when it concluded that granting permanent custody of C.M. and M.M. to appellant was not in the children's best interests. We therefore overrule the fourth assignment of error. *Page 56 
 {¶ 147} Accordingly, having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent care and custody of C.M. and M.M., to Franklin County Children Services, and which dismissed appellant's motion to modify custody.
Judgment affirmed.
McGRATH, P.J., and KLATT, J., concur.
[1] For purposes of anonymity, the minor children's names and the children's mother's name are designated by initials only and the last names of family members involved in the matter are designated by initials only. See, e.g., In re M.E.G., Franklin App. No. 06AP-1256,2007-Ohio-4308, at ¶ 1, fn. 1; State v. Johnson, Franklin App. No. 06AP-67, 2007-Ohio-2385, at ¶ 43, fn. 5, appeal not allowed,115 Ohio St.3d 1423, 2007-Ohio-5056; In re L.W., Franklin App. No. 05AP-317,2006-Ohio-644, at ¶ 1, fn. 2, appeal not allowed, 109 Ohio St.3d 1497,2006-Ohio-2762.
[2] On September 5, 2006, the juvenile court, through a magistrate, also found that D.M. had committed the offense of interference with custody, a violation of R.C. 2919.23, and adjudged her to be a delinquent minor. Finding no error of law or other defect on the face of the magistrate's decision, the juvenile court approved and adopted the magistrate's decision as its own.
Additionally, on September 5, 2006, in a separate decision, the juvenile court, through a magistrate, also found that D.M. had committed the offense of endangering children, a violation of R.C. 2919.22, and adjudged D.M. to be a delinquent minor. Finding no error of law or other defect on the face of the magistrate's decision, the juvenile court also approved and adopted this magistrate's decision as its own.
[3] At the hearing, following FCCS's presentation of evidence, claiming that FCCS failed to demonstrate by clear and convincing evidence that a permanent change in custody was in the children's best interests, D.M., through her attorney, moved for a directed verdict. (Tr. Oct. 23, 2007, at 31.) The juvenile court overruled this motion. Also, after D.M. presented evidence in her defense, D.M., through her attorney, again moved for a directed verdict. Id. at 96. The trial court also denied this motion. Id.
[4] In In re H.W., wherein the Supreme Court of Ohio "[held] a trial court does not abuse its discretion when, after a parent, or parents, involved in a custody proceeding reach the age of majority, it removes as parties to the action the child's grandparents, who have no independent legal interest or rights in the proceeding," id. at ¶ 14, the Supreme Court of Ohio recently explained:
 We recognize that ideally, grandparents will be bound to their grandchildren not only by ties of blood, but by ties of love and affection. Unfortunately, the world we live in is not always an ideal one, and at times, it becomes necessary to determine what legal rights grandparents have to their grandchildren. Grandparents may be granted visitation rights upon their motion in certain circumstances, when such rights are found to be in the best interest of the grandchild. R.C. 3109.051(B)(1) (in a divorce, dissolution, annulment, or child-support proceeding); 3109.11 (when the child's parent is deceased); 3109.12 (when the child's mother is unmarried). Grandparents may also acquire legal rights through other means, such as filing a motion for temporary or permanent custody, which would then give them standing to intervene in a custody hearing. In re Schmidt (1986), 25 Ohio St.3d 331, 336, 25 OBR 386, 496 N.E.2d 952. However, as a general rule, these are the only avenues through which grandparents may obtain rights relative to their grandchildren. The law does not provide grandparents with inherent legal rights based simply on the family relationship. In re Whitaker (1988), 36 Ohio St.3d 213, 215, 522 N.E.2d 563. We have also recognized that their legal rights may be limited. See Schmidt, 25 Ohio St.3d at 336, 25 OBR 386, 496 N.E.2d 952 ("[The grandparents'] visitation privilege cannot reasonably be construed as an absolute or constitutionally protected `right' of association").
Id. at ¶ 9.
[5] See, also, Black's Law Dictionary (8 Ed. 2004) 870 (defining "subject-matter jurisdiction" as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things"); id. (defining "personal jurisdiction" as "[a] court's power to bring a person into its adjudicative process; jurisdiction over a defendant's personal rights, rather merely over property interests").
[6] After the juvenile court rendered its judgment, R.C. 2151.07 was amended by (2007) Am. Sub. S.B. No. 155, effective December 21, 2007.
[7] After the juvenile court rendered its judgment, R.C. 2151.23 was amended by (2007) Am. Sub. S.B. No. 10, effective January 1, 2008, and (2008) Am. Sub. H.B. No. 214, effective May 14, 2008.
[8] Civ. R. 61 provides:
 No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
[9] Juv. R. 4(A) provides in part:
 Every party shall have the right to be represented by counsel and every child, parent, custodian, or other person in loco parentis the right to appointed counsel if indigent. These rights shall arise when a person becomes a party to a juvenile court proceeding. * * * This rule shall not be construed to provide for the right to appointed counsel in cases in which that right is not otherwise provided for by constitution or statute.
[10] Cf. Juv. R. 2(Y) (defining "party" as meaning, among other things, "any other person specifically design-nated by the court").
[11] Toward the end of the proceedings, the juvenile court and appellant had this exchange:
 [The Court]: * * * Miss Rosetta [J.], as a party are there any — were there any questions of any witnesses that — that you would like to have been asked that — that were not asked by anyone?
 [Ms. J.]: No, not really.
 [The Court]: Okay, then anything at closing then this is the time — in other words what w — what's been said by the counsel so far, * * * but as a party you have the right to ask questions which I didn't offer to you but which just occurred to me that you should — but lots of questions were asked. But that's why I'm asking where — is there — are there any questions that would have been asked of any witnesses had I offered you that chance?
 [Ms. J.]: No — no there were none. But I do as I sit here now and think I do wanna say that each time that those two children were placed in my home my granddaughter had custody of them and I had custody of her. And whenever a problem arose with her, I didn't give these children up; Children Services removed them. I do want that to be known.
 [The Court]: You didn't give Children —
 [Ms. J.] I never gave those two children up. Children Services always came in and removed them.
(Tr. Oct. 23, 2007, at 109-110.)
[12] In In re Swisher, this court stated:
 As in Williams, the record in the instant case does not contain reliable evidence concerning the children's wishes. None of the children testified at the hearing, nor were they interviewed in chambers. Although the guardian ad litem was present and questioned witnesses, she did not testify. The guardian ad litem's report filed prior to the hearing does not include an expression of the children's wishes. The guardian ad litem's recommendation, filed after the hearing, recommended that permanent custody be granted to FCCS, but does not include a statement regarding the children's wishes. Further, the caseworker's testimony regarding the children's wishes may not be considered. See In re C.M., Summit App. No. 21372, 2003-Ohio-5040, at ¶ 15.
Id. at ¶ 40.
[13] R.C. 2151.41, which concerned abusing or contributing to the delinquency of a minor, was repealed effective March 6, 1986. See, generally, R.C. 2919.24 (analogous provision to former R.C. 2151.41). Rather than former R.C. 2151.41, we presume appellant relies upon R.C. 2151.414. R.C. 2151.414(D)(1) provides in part:
 In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]
[14] Prior to this testimony, Ms. Knight testified that appellant requested one hour of visitation every week, not every other week. Id. at 60. *Page 1